McCOURT et al. v. SINGERS-BIGGER.

SINGERS-BIGGER v. McCOURT et al.

(Circuit Court of Appeals, Eighth Circuit. March 24, 1906.)

Nos. 2,283, 2,284.

1. CORPORATIONS—DIRECTORS—RELATIONSHIP TO STOCKHOLDERS.

The directors and officers of a corporation stand in a strictly fiduciary relation toward its stockholders, and are accountable to them on the principles governing that relationship.

[Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, §§ 1350, 1351.]

2. LANDLORD AND TENANT—RENEWAL OF LEASE—RIGHT OF TENANT AS AGAINST THIRD PERSONS.

A tenant under a lease, while having no absolute right to a renewal as against the landlord, in the absence of provision therefor, has a reasonable expectancy of renewal which is regarded in equity as property, and, if one standing in a fiduciary relation to him secures a renewal to himself, a court of equity will treat him as holding the new lease in trust for the original lessee.

3. CORPORATIONS—BREACH OF TRUST BY OFFICER—SUIT BY STOCKHOLDER.

Complainant and one of the defendants owned practically all of the stock of a corporation, which for a number of years successfully and profitably conducted two theaters held under leases for terms of years. Complainant resided in a foreign country, and the business of the corporation was managed by the resident defendant, who was president and an agent appointed by complainant to represent her interests, who was given a share of stock and elected an officer and director. Complainant reposed the utmost confidence in both of such managers and relied on them to protect the interests of the corporation in all respects. A year or two before the expiration of the leases, such defendant, without complainant's knowledge, organized a new corporation in his own interest and procured a renewal of the leases to such corporation. Held, that such action was a clear breach of his duty to the old corporation and to complainant, and the new corporation was properly decreed to hold the renewal leases in trust for the old company and required to transfer them to it.

**4. Principal and Agent—Estoppel by Acquiescence of Agent—Fraud of Agent.**

The fact that complainant's agent had knowledge of the purpose of the president of the company to secure the renewal of the leases for his own benefit, and acquiesced therein, did not work an estoppel upon either the company or complainant; it being shown that he studiously concealed his knowledge from complainant, and that such bad faith and fraudulent conduct toward his principal was known to and participated in by the defendant who obtained the renewals.

**5. Appeal—Questions Presented for Review—Statement of Account by Master.**

A statement of account between parties, made by a master by direction of the court, and approved by it, cannot be reviewed by an appellate court, where the master was not required to report all of the evidence taken before him, and it affirmatively appears that he did not.

**6. Corporations—Breach of Trust by Officer—Accounting.**

Where the president of a corporation operating leased theaters wrongfully secured a renewal of the leases to a new corporation organized by him, which thereafter operated the theaters until they were recovered by the old company, on an accounting for the profits of such operation he is not entitled to charge the old company with an increased salary paid him by the new company which he controlled.

**7. Same—Stockholders' Suit—Allowance of Expenses from Fund Recovered.**

A stockholder of a corporation, who by a suit instituted in its behalf recovers a fund which had wrongfully been diverted by its officers, is entitled to be reimbursed therefrom his reasonable attorneys' fees and expenses paid by him in the prosecution of the suit; but other stockholders and officers who resist such recovery, although defending in the name of the company, are not entitled to such allowance.

**8. Same—Salaries of Officers.**

Where the stockholders of a corporation, on the death of its president, elected other stockholders officers to manage its business, reasonable salaries paid them for services so rendered cannot be recovered in a suit by a stockholder, although no formal resolution was adopted fixing the amount of their salaries.

**9. Same—Accounting by Agents.**

Where, in a suit by a stockholder, a corporation recovered the profits realized in the operation of certain theaters, on the ground that the leases thereof in equity belonged to the corporation, and that they were operated by defendants as its agents, defendants are entitled to a deduction for losses incurred in the operation of one of the theaters in the summer, where such operation was undertaken in good faith, as within the legitimate scope of the corporation's business, although when previously conducting the theater it had not been opened during the summer season.

**10. Same—Interest.**

On an accounting in favor of a corporation for profits realized by defendants from a business which in equity belonged to the corporation, interest is not recoverable on the sum so recovered, where the conduct of the business required reserve capital, and it does not appear from the evidence when such profits would properly have been applicable to the payment of dividends.

Appeal from the Circuit Court of the United States for the District of Colorado.

This was a suit in equity brought by Marie Antoinette Singers-Bigger, a citizen of Great Britain, as complainant, for and on behalf of the Colorado Amusement Company, a Colorado corporation of which she was a stockholder, and which had refused to bring the suit, against the defendant, the Consolidated

Amusement Company, a corporation of Colorado, its officers and others, to impress certain leasehold estates held by the latter corporation, with a trust in favor of the former, for an accounting concerning the profits made by the latter in the operation of the leasehold estates, and for other relief.

There is little, if any, dispute about the facts important in the consideration of the main question of liability. William H. Bush and Peter McCourt, prior to 1897, were copartners in the theatrical business, conducting two theaters in Denver known as the "Broadway Theater" and the "Tabor Grand Opera House." In 1897 they organized the first-mentioned corporation with a capital of $50,000, divided into 50,000 shares of $1 each, with a board of directors to consist of three persons with powers adequate for conducting a general theatrical business, and transferred to the corporation the two leases under which they had held the two mentioned theaters, in full payment of the capital stock of the company. By their direction all the stock, with the exception of one share each for themselves and two other shares reserved to qualify others from time to time as directors, was issued, share and share alike, to their wives; 24,998 shares to Eleanor Bush, and the same number to Emma F. McCourt. Mr. Bush was chosen president, Mr. McCourt vice president and secretary, and one Mays, to whom one share of stock was issued, treasurer. With this executive organization the corporation, in March, 1897, entered upon the conduct of the business of the two theaters and continued so to do until Mr. Bush's death, in October, 1898. Soon thereafter, in November, 1898, Mrs. Bush caused one share of her stock to be issued to Frank C. Young, of Denver, and about the same time appointed him as her agent and attorney to represent and conserve her interests in the amusement company. He was, by appropriate action soon after, made a director and vice president of the company, and remained so until the institution of this suit. Mrs. Bush died in April, 1899, leaving her stock to her daughter, the complainant in this cause, who, in February, 1900, secured a certificate transferring it to her. Mr. Young thereafter continued to represent the complainant in the same way and with the same powers with which he theretofore represented her mother. The evidence shows that she imposed implicit confidence in him; that the business of the company was good, making net earnings sufficient to pay large dividends on the capital stock; and that such dividends were frequently declared and paid. Such was the condition of the company and its business in 1899. It was under the exclusive management of Mr. McCourt and Mr. Young, who represented practically all the stock. They agreed upon a salary of $100 a week for Mr. McCourt and of $25 a week for Mr. Young, and worked under this arrangement until February, 1900, when at a special meeting of the board of directors they fixed their salaries at $600 per month for Mr. McCourt and $1,300 per year for Mr. Young, and ordered that the same should be paid from and after September, 1899. Correspondence between complainant and Mr. Young during the year of 1899, and later, discloses a condition of perfect confidence and trust on her part towards him. The operations of the company consisted almost exclusively in conducting the theatrical business in the two theaters mentioned. The terms for which they were leased to the company expired in April and September, respectively, in 1901. Young, as well as McCourt, knew that fact. There was no covenant for renewal in either of the leases.

Some time about July, 1899, when McCourt was acting as president and general manager of the company, Young, as its vice president, and both as practically the whole board of directors, McCourt had a conversation with Young in which he disclosed his purpose to secure renewals of the leases to the theaters whenever they should expire, for his own benefit, to the exclusion of the old company and the complainant. Young assented to the execution of this purpose by McCourt. Although the leases did not expire until about two years thereafter, McCourt proceeded immediately to carry out his purpose. He, with his wife and attorney, on August 19, 1899, organized the defendant corporation, the Consolidated Amusement Company, and on that day secured the execution of a lease from the owner of the Tabor Grand Opera House to the new corporation for a term of four years, commencing April 5, 1901, the date of the expiration of the existing lease, and at a later date, November 2,

1900, secured a like lease from the owner of the Broadway Theater, for a term of four years, commencing September 21, 1901, the date of the expiration of the existing lease on that theater. During the time intervening between the execution of these leases and the expiration of the old ones, the theatrical business seemed to proceed much as before. The complainant had no actual knowledge of either the organization of the new corporation, McCourt's purpose as disclosed to Young, Young's assent thereto, or the execution of the leases to the new corporation. On the contrary, the proof shows that in the summer of 1899, while this purpose was being conceived and executed by McCourt and Young, Mr. Bigger, the husband of the complainant, came from England to this country, and, representing his wife for that purpose, had a conversation with McCourt and Young separately, concerning the renewals of the two leases when their respective terms should expire. No information was given him concerning McCourt's purpose. On the contrary, upon his expression of anxiety concerning the renewals of the leases, he was assured that McCourt would do his best to obtain the same for the company. In fact, knowledge of McCourt's purpose or Young's acquiescence in it was not brought home to complainant until some time in the summer of 1901, a long time after the organization of the new corporation and the execution of both leases to it.

Complainant contends that the taking of those leases by McCourt, while acting as a director and president of the old company, for his own benefit, was in fraud of the rights of the old company and in fraud of her rights as a stockholder therein. Defendants contend to the contrary and claim affirmatively that Young's acquiescence in McCourt's conduct estops complainant from questioning the transaction. Some other special features are raised by the pleadings which will be sufficiently noticed in the progress of the opinion.

The cause was finally submitted to the court on the pleadings with voluminous testimony taken before an examiner. A decree followed, finding the equities in favor of the complainant, and that defendants Young and Billings, who each held one share of complainant's stock, assign and deliver the same to her; that the officers of the new corporation assign the new leases taken by them in its favor to the old company; that the new corporation, its officers and Young, account to the old company for all moneys earned in the operation of the two theaters by or in the name of the new corporation; that the officers of the old company likewise account to it for moneys received by them belonging to it, and the cause was referred to a master to take and state an account. In due time defendants performed the parts of the decree requiring the assignment of the stock by Young and Billings and the assignment of the new leases to the old company, and the last-named company was let into full and complete possession and enjoyment of the new leaseholds. This was done, however, under a stipulation providing: First, for the reorganization of the board of directors of the old company; and, second, that both the Broadway Theater and the Tabor Grand Opera House should be operated under the direction of the old company "pending a final determination by the entry of a final decree in the Circuit Court and the decision of the Circuit Court of Appeals thereon and any subsequent proceedings that may be necessary to a final adjudication of the rights of the parties." In due time the master reported that there was due from the new corporation, its officers and Young, to the old company, on March 7, 1903, the sum of $52,788.44, and that some other smaller sums were due from certain of the defendants to the old company. Upon the coming in and confirmation of this report, a final decree was entered accordingly. Both sides appeal, raising questions which we consider in their order.

W. H. Bryant, for appellants in No. 2,283 and for appellees in No. 2,284.

T. J. O'Donnell, for appellee in No. 2,283 and for appellant in No. 2,284.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Before disposing of the main question, a preliminary consideration of the obligations and duties imposed by law upon directors of a corporation may not be unprofitable. Whatever may be the technical relation between them and the corporation itself, its creditors, or the public, they are, in a general and universal sense, trustees for the stockholders. They are chosen to represent them in the enterprise upon which they mutually embark. Their duty is to use and employ the corporate assets and all corporate facilities and privileges, within the limits of powers conferred upon the corporation by law, for the ultimate benefit and advantage of the shareholders. They have no rights in such assets or facilities or privileges superior to those of their principals. They occupy toward them strictly fiduciary relations and are accountable to them on principles governing that relationship. Any action by them impairing corporate rights or sacrificing corporate interests is regarded as a flagrant breach of trust on their part. Thompson's Commentary on the Law of Corporations, vol. 3, § 4009 et seq., and cases cited.

In Ward v. Davidson, 89 Mo. 445, 458, 1 S. W. 846, Black, Judge, speaking for the court, says:

"Directors and officers of corporations occupy a position of trust and must act in the utmost good faith. They will not be allowed to deal with the corporate funds and property for their private gain. They have no right to deal with themselves and for the corporation at the same time, and they must account for the profits made by the use of the company's assets, and for moneys made by a breach of trust"—citing 1 Morawetz on Priv. Corp. (2d Ed.) § 243, 245; Field on Corp. 174; 1 Perry on Trusts (3d Ed.) § 429.

To the same effect is Wardell v. Railroad Co., 103 U. S. 651, 658, 26 L. Ed. 509.

Applying this principle, which only needs mentioning to gain unqualified assent to the case before us, how does it stand?

For years McCourt and Bush had owned and enjoyed the right to operate the theaters in question. After organizing the old company their business was conducted much as before, under the management of both Bush and McCourt as chief officers of the company. In about a year Bush died, and later Mrs. Bush, in whose name one-half of the capital stock stood, also died; and the share of the theatrical business represented by that stock descended to their daughter, the complainant in this cause. At the time she acquired her interest McCourt was a director and president of the company, and charged with all the duties and obligations imposed upon him as such. They included, as already seen, a high degree of fidelity and loyalty to complainant as a stockholder holding one-half of the stock of the company. His duty was to do all things reasonably within his power, to promote the business, and enhance the profits of the company. What could he have reasonably done? Clearly that which ordinarily prudent persons under like circumstances would do for themselves. The company was in a flourishing condition. It had an assured corporate existence of many years, and established business with a good will of great value, two leasehold estates with unexpired terms of about two years each, and, with them, all the advantages incident to such conditions. An ordinarily prudent person would undoubtedly have

bethought himself to secure an extension of such leases and thereby conserve and preserve the good will and integrity of the business. The likelihood of being able to secure such an extension under like circumstances is so great that it has come to be recognized as a valuable incident to the tenant's estate, a species of property which the law protects. McCourt clearly did not take this view of the matter, but, on the contrary, soon after the death of Mrs. Bush, deliberately devised a scheme to appropriate the business to himself. He caused the defendant corporation to be formed for his own benefit and practically destroyed the profitable business of the old company by acquiring leases of the theaters in which it had built up its business, for his new corporation. In many ways he made use of his position and powers in the old company and consumed his time which belonged to it to enhance the value and attractiveness of the theaters when they should come under the new leases. His conduct was inequitable, obviously dictated by considerations of personal interest, and far below that high degree of fidelity which the law imposed upon him as agent and trustee of the complainant.

The general rule, as declared in the American and English Encyclopedia of Law (volume 18, p. 696), is as follows:

"Though a tenant may not have any absolute right to a renewal against the will of his lessor, courts of equity recognize his reasonable expectancy of renewal as a property or asset, and if one standing in a fiduciary or quasi fiduciary relation to a lessee secures a renewal of the lease to himself, a court of equity will treat him as holding the lease in trust for the original lessee."

The principle so declared is supported by abundant authority.

In Davis v. Hamlin, 108 Ill. 39, 48 Am. Rep. 541, the Supreme Court of Illinois considered a similar question. In that case the managing agent of the owner of a theater, who by reason of his employment had learned the methods of conducting the business and had become familiar with its value and future possibilities, at the expiration of a lease in the name of his principal, privately secured a renewal thereof to himself. The court held him to be trustee with respect to that lease for his principal. Amongst other things, it said:

"The obtaining of the lease by Davis amounted to a virtual destruction of his employer's whole business at the termination of the old lease, under which the latter was holding. * * * There was a good will attached to it, which was valuable. * * * If a manager of a business were allowed to obtain such a lease for himself, there would be laid before him the inducement to produce in the mind of his principal an underestimate of the value of the lease, and to that end, may be, to mismanage so as to reduce profits, in order that he might more easily acquire the lease for himself. * * * Although there was here no right of renewal of the lease in the tenant, he had a reasonable expectation of its renewal, which courts of equity have recognized as an interest of value. * * *"

This principle was early declared by Chancellor Walworth in Phyfe v. Wardell & Woolley, 5 Paige (N. Y.) 268, 28 Am. Dec. 430. He there lays down the doctrine in these words:

"If a person who has a particular or special interest in a lease obtains a renewal thereof from the circumstance of his being in possession as tenant, or from having such particular interest, the renewed lease is, in equity, considered as a mere continuance of the original lease, subject to the additional

charges upon the renewal, for the purpose of protecting the equitable rights of all parties who had any interest either legal or equitable in the old lease."

To the same effect are Gibbes v. Jenkins, 3 Sandford, Ch. (N. Y.) 130, 134; Mitchell v. Reed, 61 N. Y. 123, 129, 19 Am. Rep. 252; Johnson's Appeal, 115 Pa. 129, 133, 8 Atl. 36, 2 Am. St. Rep. 539; Hannerty v. Standard Theater Company, 109 Mo. 297, 19 S. W. 82; Cushing v. Danforth, 76 Me. 114; Bennett v. Vansyckel, 4 Duer (N. Y.) 462, 472.

In the case of Robinson v. Jewett, 116 N. Y. 40, 51, 22 N. E. 224, the Court of Appeals of that state well expresses the doctrine and reasons for it. It there says:

"Those who are in possession of lands under a lease have an interest therein beyond the subsisting term, usually called the tenant's right of renewal. Between the landlord and tenant this interest cannot strictly be denominated a right or estate, but is merely a hope or expectation; there being, in the absence of contract, no way, legal or equitable, of compelling a renewal. But, as between third persons, the law recognizes this interest as a valuable property right, and the renewal as a reasonable expectancy of the tenants in possession. * * * It [the rule] is appropriately applied to a trustee of a corporation taking in his own name a renewal lease of the premises in possession of the corporation. Every consideration, legal or moral, requires that the trustee should protect the corporation and its property and see that the interest of other stockholders suffer no loss from his default. * * * Between the trustee and the corporation the right of renewal of the lease is a property right, and, if the lease is renewed in the name of the officer, it enures to the benefit of the corporation."

Citation of further authorities seems unnecessary. The principle declared in the cases already referred to are clearly applicable to the relation shown to exist between McCourt and the old corporation and its stockholders.

We have carefully examined the authorities relied upon by defendant's counsel and find nothing inconsistent with the principles announced. McCourt's relation to the stockholders of the old company was as much that of an agent as one partner is the agent of another. He was so, not only theoretically, but in fact. The complainant resided in London and had little, if any, actual knowledge of the conduct of the business of the old company. She, inspired so to do by the known confidential relations existing between her father and mother and McCourt, imposed implicit confidence in him. She, in fact, reposed in him all the confidence and trust with which the law theoretically charged him in her favor. His conduct in securing new leases to another corporation for his own benefit was a clear breach of his duty to her and the old corporation.

But it is contended that McCourt informed Young of his purpose to take new leases for his own benefit and exclude Mrs. Bigger from any interest in them, and that Young acquiesced therein; that this is the equivalent of consent by Mrs. Bigger, for whom Mr. Young was acting as agent. It is not necessary to place our answer to this contention on the technical ground that Young had no power to bind the old company, whose rights would be destroyed by the threatened action of Mr. McCourt, even if he was Mrs. Bigger's

agent. Young was not only agent for Mrs. Bigger by virtue of his contract of agency, but, as director and vice president of the old company, was by law trustee and agent for her, and thus doubly bound to promote and conserve her interests. He not only did not object to McCourt's proposition to sacrifice the rights of the old company in which she was so largely interested, but, although he subsequently had much business correspondence with her and knew that she was depending largely upon the income from the theatrical business for many of her own necessities, he made no reference to McCourt's avowed purpose. Not only so, but we are satisfied from the evidence that when Mr. Bigger, the husband of complainant, was in this country in the summer of 1899 making inquiries of both McCourt and Young concerning the prospect of renewal of the leases, information concerning McCourt's proposition was studiously withheld from him. If Young had been faithful to his duty and to the high trust he had undertaken, he would have denounced McCourt's declared purpose with indignation. Certainly, if for any reason it was embarrassing for him to act against McCourt, he should have informed his principal of McCourt's purpose in order that she might take appropriate steps for her own protection. He knew that execution of McCourt's purpose would have the effect to destroy the right of property resting in the reasonable expectancy of renewal of the old leases—put the Colorado Amusement Company wholly out of business and deprive her of much needed income. His consent to or acquiescence in that destructive purpose was far outside the scope of his agency. He was employed, as he says, "to serve her interests to the best of his ability," not to sacrifice them or deliberately give away or destroy her property. On the whole, we are impressed, from a careful consideration of all the proof, that the secrecy preserved by Young, when he should have spoken, especially the failure to disclose McCourt's purpose either to Mr. or Mrs. Bigger when opportunity by personal interview or correspondence offered, and the manifest partisanship on his part in favor of McCourt when the disclosure of his breach of trust was made, in 1901, evince bad faith and a fraudulent purpose on his part, and one known to and participated in by McCourt. Such bad faith and fraudulent conduct on the part of the agent, participated in by the wrongdoer, cannot form the basis of an estoppel against the principal's asserting its rights against the wrongdoer.

Conceding the proposition urged upon us by counsel for defendants that no trust relationship exists between stockholders as such, we are unable to perceive its application to facts of this case. McCourt voluntarily, and for compensation satisfactory to himself, assumed duties of care and management, which, as a stockholder, did not belong to him, and were not cast upon him. The assumption of those duties brought with it a burden of trust and responsibility towards shareholders which we have already sufficiently considered.

There was, in our opinion, no error in holding the new corporation to be trustee for the old company so far as the new leases were concerned, or in the provisions of the decree requiring their transfer to the old company, or in the order for an accounting.

Before considering other assignments of error founded on the master's report, certain facts relating to the report and conclusions of law thereon should receive attention.

By the interlocutory decree passed March 13, 1903, after ordering the immediate assignment of certain two shares of stock to complainant and also the leases to the old company, and after making provision for putting the old company into full possession and enjoyment of the theaters as the equitable owner of the leases made to the new corporation, the cause was referred to a master of the court to take and state an account: (1) Showing what money came into the hands of defendants, Peter McCourt, Emma F. McCourt, and Frank C. Young, belonging to the old company and not accounted for by them; (2) showing the gains and profits resulting from the operation of the two theaters from and after the beginning of the new terms under the leases to the new corporation; (3) showing the reasonable value of the services of complainant's solicitor and any other costs and expenses incurred by her in bringing and maintaining this suit. On June 6, 1904, he made and filed his report, stating the accounts, as ordered, for the approval of the court. Many assignments of error are predicated upon the action of the trial court in sustaining and overruling exceptions to this report, but complainant's counsel insists that we cannot review the facts found by the master and approved by the court because of the condition of the record. There was no order requiring the master to report evidence or procedure before him, and no report of that kind was made. Before the interlocutory decree and before the case went to the master, much evidence relevant to the issues submitted to him had been taken. The order of reference leaves it uncertain whether that evidence went to the master or not, but we assume it did. From the nature of the duties imposed upon the master, as well as from the facts disclosed by the record, it appears that he heard and considered evidence not reported by him to the court and not filed in the case before the order of reference was made to him. (How much or how little we are unable to ascertain and do not know.) On the existence of this fact one of the defendant's assignments of error is predicated that "the court erred in permitting the master to take evidence and render any accounting whatsoever in the cause." The master states at the end of his report that:

"The transcript of the evidence produced in these proceedings, the brief and transcript of the argument of counsel, and the exhibits received in evidence, are filed herewith, excepting such exhibits as by consent of counsel are in possession of the parties."

Counsel for defendants contend that his certificate shows that the master sent to the Circuit Court all the evidence, whether heard before him or which he had considered. Such, in our opinion, is not the meaning of the language employed. He nowhere states that he returns any evidence taken before him. The certificate admits of a construction to the effect that he returned the evidence which had been taken in the case before it was referred to him, and this is probably true; for it clearly appears that he did not, in fact, return some

evidence which his report, as well as the assignment of error in the case, says he considered. Not having before us all the evidence upon which the master acted, it is impossible to review any question of fact determined by him and approved by the court.

Mr. Justice Clifford, when holding the Circuit Court in Massachusetts, in the case of Greene v. Bishop, 1 Cliff. 186, Fed. Cas. No. 5,763, quoting from Judge Story in Donnell v. Columbian Ins. Co., Fed. Cas. No. 3,987, says:

"When exceptions are taken to the report of a master in chancery, the evidence which furnishes the ground of the exception should be required by the party excepting to be stated by the master, and in effect declared that, unless it be done the court will not enter at large into the evidence in order to ascertain whether or not the master was wrong in his conclusion. Masters are required, in a case like the present, to report conclusions, and, in general, it is irregular for them to incorporate the details of the evidence into their reports, without the direction of the court. They should, however, especially when it is requested by either party, specify and identify the evidence, and refer to it in such a manner as to inform the court on what state of facts their conclusions are based."

The rule is firmly established that reports of masters appointed to take and state accounts depending as they do upon examination of books, oral testimony of witnesses, and perhaps expert testimony, have "every reasonable presumption in their favor and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part." Camden v. Stuart, 144 U. S. 104, 118, 12 Sup. Ct. 585, 36 L. Ed. 363. "As every presumption is in favor of the referee's report, the court will, in reviewing the judgment upon appeal, intend that the referee did find such further fact in favor of the party recovering, as essential to support it." Meyer v. Lathrop, 73 N. Y. 315, 321. See, also, Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289.

In Sheffield, etc., Railway Co. v. Gordon, 151 U. S. 285, 293, 14 Sup. Ct. 343, 38 L. Ed. 164, the Supreme Court, in considering exceptions to a master's report, says:

"There is another objection, however, to our examination of the facts in this case. The order referring the case to the special master, though minute in its details, did not require him to send up the testimony; neither does he purport to do this in his report; and, while a number of depositions taken before him are filed, there is nothing to indicate that these were all the testimony in the case. * * * In the absence of any certificate that the entire evidence taken by the master was sent up with his report, it is impossible to impeach his conclusion in this particular. Scotten v. Sutter, 37 Mich. 526; Nay v. Byers, 13 Ind. 412; Fellenzer v. Van Valzah, 95 Ind. 128. There is no presumption that all the testimony was sent up."

The court then, referring to a certain finding made by the master, says:

"And there is no evidence to impeach his finding in that particular, and no objection or exception taken to the want of proof upon this point. There would appear to have been, from a memorandum we find in the testimony, a mechanic's lien introduced in evidence as an exhibit; but, as it is not attached to the record, it is impossible to say that it does not bear out the finding of the master."

The case before us falls fairly within the principles announced in the last-mentioned one, and we are constrained to hold that for want of any showing that we have before us the evidence which was before the master, and especially in the light of the affirmative showing that we have not before us all the evidence which was before him, it is impossible to review any of the findings made by him which from their nature may be affected one way or the other by evidence. Certain of his conclusions raise questions of law only, and these will now be considered.

The first assignment of error predicated upon the findings of the master relates to the charge allowed by the master and approved by the court of $2,972.22 as net profits made in operating the so-called Silver Circuit, which Mr. McCourt appropriated to his own use. This Silver Circuit was the name of an agency by which theatrical attractions were booked for theaters in smaller towns in Colorado. Complainant claims that the business of the agency was transacted by the employés of the Colorado Amusement Company for its account, and that it was entitled to all the net profits realized. McCourt claims that the agency was an outside venture of his own, and that the profits made belonged to him. The master, as it affirmatively appears from his report, heard evidence on this item which is not before us, particularly the testimony of Richard B. Mays. It is therefore impossible for us to review his conclusion.

It is next contended that the master improperly disallowed a claim made by McCourt against the funds of the old company for increased salary for the period between April 5, 1901, when the consolidated company first took possession of the Broadway Theater, to March 7, 1903. Before April 5, 1901, McCourt, by resolution of the old board, had his salary fixed at $600 per month. After he had, as he supposed, banished complainant from participation or representation in the business, he secured a resolution from his new board increasing his salary to $200 per week; the increase amounting for the period mentioned to $4,060. Some evidence may have been heard by the master concerning this item which does not appear in the record, and which would have fully justified his finding; but, if there was no such evidence, we think he did not err in disallowing the claim. It cannot be true that McCourt, after unlawfully despoiling the old company, could arbitrarily and without authority transfer its assets to a new one owned, managed, and controlled practically by himself, and substantially enlarge his compensation for services and make the same a charge against the old company. This would reward disloyalty in a way shocking to a court of conscience. Moreover, there is no evidence in the record except that of McCourt himself that the increase was reasonable, and this we regard as quite insufficient to overcome the presumption that the salary fixed for the same services by the board of directors of the old company, shortly before it was despoiled, was reasonable.

The next assignment challenges the ruling of the trial court approving the action of the master in allowing, against the fund recovered, attorney's fees and other expenses paid by complainant for

the prosecution of the action, and in disallowing like fees and expenses paid by defendants in defending the action. Complainant claims that, as she undertook the burden and bore the expense of restoring to the old company property and funds which had been taken from it, it should first repay to her out of the funds restored what she had paid for its benefit, before dividing the same between others, including those whose conduct rendered the outlays and expenses necessary. This claim is equitable and just and supported by abundant authority.

In Trustees v. Greenough, 105 U. S. 527, 26 L. Ed. 1157, our Supreme Court makes an exhaustive review of the English and American authorities on this subject, and, on pages 532, 533, and 536, 105 U. S. (26 L. Ed. 1157), makes use of the following language:

"It is also established by sufficient authority that, where one of many parties having a common interest in a trust fund at his own expense takes proper proceedings to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement, either out of the fund itself, or by proportional contribution from those who accept the benefit of his effects. * * * It has been the common practice, as well in the courts of the United States as in those of the states, to make fair and just allowances for expenses and counsel fees to the trustees, or other parties promoting the litigation and securing the due application of the property to the trusts and charges to which it was subject. * * * Allowances of this kind, if made with moderation and a jealous regard to the rights of those who are interested in the fund, are not only admissible, but agreeable to the principles of equity and justice."

To the same effect are the following cases: Central Railroad & Banking Co. v. Pettus, 113 U. S. 122, 124, 126, 5 Sup. Ct. 387, 28 L. Ed. 915; Hobbs v. McClean, 117 U. S. 567, 582, 6 Sup. Ct. 870, 29 L. Ed. 940; Dodge v. Tulleys, 144 U. S. 457, 12 Sup. Ct. 728, 36 L. Ed. 501; Central Trust Co. v. Condon, 14 C. C. A. 314, 67 Fed. 84, 110; Burden Central Sugar Ref. Co. v. Ferris Sugar Mfg. Co., 31 C. C. A. 233, 87 Fed. 810; 2 Perry on Trusts, § 894 et seq.; In re Weed's Estate, 163 Pa. 599, 602, 30 Atl. 272, 278; White v. University Land Co., 49 Mo. App. 450.

The same reasons which justify an allowance out of the fund in favor of complainant for expenses incurred in restoring it require us to approve of the disallowance of such items in favor of the defendants. They did nothing to recover or save a trust fund, or to prevent its waste or dissipation, but everything in their power to prevent its recovery or restitution to its original owner. Their proceedings, while in the name of the old company, which was made a defendant, were adversary to its equitable rights. Instead of being rewarded by an allowance of costs and expenses, they should pay all the statutory costs taxable against them.

No authorities are cited by counsel or found by us sustaining defendants' claim, and we certainly shall not be the first to reward obstructionists out of a restored fund in proceedings necessarily and vigorously prosecuted to regain that fund.

The next item of charge against the old company disallowed by the master and Circuit Court is $2,678.04, loss said to have been incurred in 1902 and 1903, in operating a third theater called the Empire Theater, in Denver. Whether the venture was reasonably

within the scope of the business of the old company, or undertaken prudently by defendants, or whether the business was so managed as to subject the old company to liability for its loss, all depend largely upon the attendant facts. The record fails to disclose what they are, and we must necessarily indulge the presumption that the master and trial court were correct in disallowing them.

By the appeal of complainant she challenges the action of the master and trial court in allowing McCourt $5,200 and Young $1,175, as salaries for services rendered the old company between October 12, 1898, the date of the death of Mr. Bush, and September 1, 1899, the date when the new schedule of salaries fixed February 5, 1900, went into effect. Following Bush's death McCourt was made president and treasurer of the company, and Young was made vice president. Both had duties to discharge for and on behalf of the company, and there is no proof that they failed to discharge them. The contention that, because, prior to Bush's death, neither Bush nor McCourt drew any salary, does not justify the conclusion that the changes wrought by his death did not entitle his successors to compensation. Neither does the fact that, during the period in question, no resolution was formally adopted fixing their salaries, justify a disallowance of compensation taken by them during that period for services actually rendered. For reasons already stated we cannot inquire into the facts showing the reasonableness or unreasonableness of the amounts allowed by the trial court.

Complainant also assigns as error the allowance by the Circuit Court to the defendants of the sum of $2,909.64 for loss sustained in the operation of the Broadway Theater in the summer of 1902. The contention is that, because the old company had never before opened the theater in the summer time, the new corporation should not have done so; and that any loss sustained by it in so doing is not chargeable against the old company in this accounting. We cannot agree with this contention. The theory of complainant's bill and of the decree rendered thereon is that the new leases belonged in equity to the old company, and that the individual defendants were at all times, although the leases stood in the name of the new corporation, carrying on the theatrical business as agents for the old company. The opening of one of the theaters in the summer season was clearly within the general scope of the business of the old company, and its results, whether profitable or unprofitable, in the absence of bad faith, enure to the advantage or disadvantage of the principal, as the case may be. The evidence before us fails to disclose any bad faith in the matter of conducting the summer theater, and the trial court did not err in allowing the defendants a credit for the loss sustained in the venture.

Complainant's next assignment is as follows:

"That the court below erred in overruling complainant's sixth exception to the report of the master, because it appears from the record that the respondents Peter McCourt, Emma F. McCourt, Frank C. Young, and the Consolidated Amusement Company wrongfully withheld and detained the moneys of the respondent the Colorado Amusement Company, after demands for the same were made both by the institution of this suit and otherwise, and in-

terest should be allowed for the period of such detention by way of compensation, or by way of damages."

This exception relates to interest for detention of the sum of $52,788.44, found by the master to have been earned in the two years prior to the interlocutory decree as a result of the operations of the two theaters. There are two reasons why we cannot sustain this assignment. The first is that it is impossible to ascertain from the master's report at what times the sum in question, or any of its constituent parts, so accrued as to be available for distribution. The master's report shows that from April 5, 1891, to March 7, 1903, when the interlocutory decree made provisions for the future, the Tabor Grand Opera House received the total sum of $342,314.08, and expended $300,100.86; and that during practically the same period the Broadway Theater received.$335,255.17, and expended $316,-762.94. The business appears to have been one requiring large capital and in which large amounts of money were actually employed. Considerable money was necessarily required to be kept on hand to meet the current and incidental expenses. Common prudence dictated that a further sum should be kept on hand to meet possible exigencies of the business. How much should have been reserved for these purposes was a matter for the board of directors to determine from time to time in the exercise of good judgment. It is impossible, so far as this record discloses, to say that $52,000 was too much for such purposes, and it is certainly impossible to say how long before March 7, 1903, the $52,000 was on hand, or at what particular time any part of it was available for dividends. In the light of these uncertainties we cannot interfere with the conclusion of the master and the trial court which had before them all the facts, agreements, and stipulations of the parties.

We recognize fully the doctrine laid down by this court in New Dunderberg Min. Co. v. Old et al., 38 C. C. A. 89, 97 Fed. 150, wherein it is said:

"When property or money has been wrongfully appropriated or converted by a defendant, interest should be given as damages to compensate the complainant for the loss of the use of the proceeds of his property or his funds."

That case came from the district of Colorado, and considered and construed the statutes and decisions of the Supreme Court of that state, and with its doctrine we make no question. Our ruling on this assignment rests exclusively upon the grounds above mentioned.

The action of the lower court with respect to some other small items is complained of; but, after a careful consideration of them, we find no reason for disturbing the conclusion reached.

The decree as rendered was substantially correct, and is accordingly affirmed.