**SKINNER et al. v. CROMWELL et al.,
Trustees.**

**No. 127.**

Circuit Court of Appeals, Tenth Circuit.

April 4, 1930.

Robert Stone, of Topeka, Kan. (Joseph C. Stone, of Muskogee, Okl., and E. H. Gamble, of Kansas City, Mo., on the brief), for appellants.

A. A. Davidson, of Independence, Kan. (Preston C. West, N. A. Gibson, and J. L. Hull, all of Tulsa, Okl., on the brief), for appellees J. I. Cromwell and York Oil & Gas Co.

Before LEWIS, COTTERAL, and PHILLIPS, Circuit Judges.

LEWIS, Circuit Judge.

On March 6, 1925, the appellants filed their bill in behalf of themselves as beneficiaries in the Oklahoma-Louisiana Syndicate, and for those similarly situated, against Cromwell, Graves and Warne, as trustees for said syndicate, against Cromwell and Graves individually, and against three named oil companies, in which they asked that the trustees be enjoined from acting further as such, that a receiver of the trust property be appointed, that the trust estate be closed and its assets distributed among the beneficiaries, that Cromwell and Graves be held to account for their administration of the trust and that judgment be rendered against them for the value of certain property that had belonged to the estate which it was alleged they had wrongfully sold and converted to their own use. The trust estate, when the trust was formulated, consisted entirely of oil and gas leases given to Cromwell and Graves on lands in Louisiana and Oklahoma, and they proposed the trust in a written statement to which the beneficiaries made their subscriptions, thus:

"Subscription Memorandum.

"Kansas City, Missouri, June 30, 1920.

"Whereas, E. L. Graves and J. L. Cromwell of Oklahoma, and associates, are the owners of good subsisting leases on oil and gas lands in Oklahoma and Louisiana selected and purchased by them with the assistance of a competent geologist, comprising 3,307 acres in nine parishes in Louisiana and 1,080 acres in six counties in Oklahoma, a total of 4,387 acres in 35 separate tracts as scheduled and described in detail in the written statements, geological reports and maps presented herewith; and

"Whereas, These oil properties are appraised at $62,413 as itemized on lists shown, the owners now offer to sell an undivided three-fourths interest amounting to $46,810 and retain the other one-fourth interest amounting to $15,603 of the foregoing appraisement; the properties to be transferred under a trust contract that recites supervision, control and disposition of them to a trustee selected by the several purchasers;

"Now, Therefore, it is mutually that the subscribers hereto agree to buy an undivided interest as above explained equal to the amount written opposite his name, after payment therefor said interest to be included in a declaration of trust combining the interests of all purchasers and present owners.

| Name | Amount | |
|---|---|---|
| H. G. Warne | | $5,000.00 |
| H. B. Keim | | 5,000.00 |
| Dr. H. S. Hickok | | 5,000.00 |
| N. C. Eastabrooks | | 5,000.00 |
| Chas. A. McNeese | $2,500.00 | |
| A. M. Bates | 1,000.00 | |
| Martha Thompson | | 5,000.00 |
| Stone Gamble McDermott & Wife | 2,500.00) | |
| McCaules Kennard & Trusty | 2,500.00)" | |

Then on August 18, 1920, the trustees executed a declaration of trust, to which was attached a description of lands in ten Louisiana parishes and six Oklahoma counties, on which Cromwell and Graves had obtained and then held oil and gas leases. And the declaration stated that the trustees held said property (leases) and all profits and proceeds thereafter arising therefrom, and all future accessions and additions thereto, in trust as an estate for the benefit of the shareholders. The whole number of shares, stated in the declaration, was to be 625, of no par value and non-assessable. The trustees were to issue to the subscribers certificates for their shares, the form being prescribed, each share to represent a 1/625th interest in the trust estate. These certificates on endorsement and surrender entitled the transferee to a new certificate from the trustees. The shareholders were not to be liable for debts of the trustees and the trustees liable only to the extent of the trust estate. Each shareholder was to participate pro-rata in profits and assets on distribution. The trustees, however, might deduct from funds of the trust estate expenses incurred in its administration and a reasonable compensation for their services. The trustees were to constitute a board, but their action was not confined to board meetings. Any two of them controlled, and their acts would be valid and binding. They were to keep papers, books and accounts of the trustees separate and apart from all other papers, books and accounts, accessible and open to the inspection of any shareholder, and they were to render to each shareholder a quarterly account and report of the financial condition of the estate. The life of the trust was limited to twenty years . The power of the trustees was broad: To sell, pledge or mortgage any property belonging to the estate, to apply any income of the estate to its development or the acquisition of additional property, and to do all lawful acts and transact any business incident or appurtenant to and consistent with the terms of the trust. When the trust agreement was executed by the trustees the leases, all in the names of Cromwell and Graves, were assigned by them to the trustees. Cromwell and Graves resided in Oklahoma and Warne in Kansas City, Missouri.

The record does not show the names of the shareholders and the shares held by each at the time of the trial, but from an exhibit attached to the bill it seems that three-fourths of the offered shares were not subscribed, only 275. That left 350 unsold in the hands of Cromwell and Graves, and the testimony indicates that some of the subscribers did not and have not paid their subscriptions in full, so that, Cromwell and Graves, instead of receiving $46,810.00, as proposed in the subscription memorandum, for assigning the leases to the syndicate, received, according to the proof, less than $25,000. But the parties interested went on with the trust arrangement. All of the leases were of speculative value, none was producing mineral, or then being prospected and developed, and it could not have been believed or hoped that many of them would ever be productive. Which of them would prove to be of value because of underlying oil or gas was a recognized un-

certainty to be solved only by expensive development on the leased or adjoining lands, and the syndicate had no funds to make those developments. Obviously, the purpose was to wait for development by others in the neighborhood or by subletting. The whole venture was highly speculative. Cromwell was an experienced oil man and had some expert knowledge, from the geological standpoint, in locating oil fields. He and Graves commended the locations of their leases, but the leases required payments of annual rentals to keep them in force. The syndicate had no funds and no arrangement was made by the parties interested for the payment of these rentals. The shares were non-assessable. None of the trustees obligated themselves to make these payments. Cromwell and Graves, however, paid rentals out of their own funds to an amount of about $4,000 on what they considered the best leases, to keep them in force. For non-payment of these annual accruals the greater part of the leases in Louisiana lapsed the first year. Graves, in June, 1921, wrote Warne, who was president of the board of trustees, about the necessity of raising funds to pay these rentals, and suggested that he ask the shareholders to contribute ten per cent. of their subscriptions for that purpose, but Warne's request for contributions was ignored. When Warne learned from Graves' letter, received in June, 1921, that a large number of leases had lapsed for nonpayment of rentals, he called a meeting of the trustees at Kansas City for July 20, 1921. The three trustees and some of the shareholders were at that meeting and the discussion of the syndicate's affairs had at that time is the basis of a large part of appellants' claim in this suit. We leave that meeting for the present and will come back to it later.

Among the leases put into the trust by Cromwell and Graves and named in the schedule attached to the declaration of trust was a lease to Cromwell and Graves given by Sam Little, an Indian allottee, on his homestead of 120 acres in Okfuskee county, Oklahoma. Little's wife did not join him in executing that lease, and in the latter part of 1922 Cromwell and Graves surrendered it and took a new lease on the homestead from Little and wife, on the same terms and conditions that were contained in the prior lease. This was done because the Court of Appeals for the Eighth Circuit, on July 3, 1922, had held in Sperry O. & G. Co. v. Chisholm, 282 F. 93 (reversed in 264 U. S. 488, 44 S. Ct. 372, 68 L. Ed. 803), that such lease, without the wife's joinder, was void. The negotiations leading to the approval of the new lease to Cromwell and Graves from Little and wife by the Secretary of the Interior, were these: On September 27, 1922, Cromwell wrote to the Superintendent of the Five Civilized Tribes calling attention to the decision of the Court of Appeals in its holding that such a lease as that given by Little was not legally made because Little's wife did not join in its execution, and said:

"In order to legalize the title to our lease defined under these decisions, we ask relief on the part of the lessors by submitting hereto attached, an oil and gas lease executed by Sam Little, the allottee, and Hepsy Little, his wife, for your consideration and approval as a substitute lease, bearing the same rental and royalty, * * * to cover the unexpired time of the original lease. My attorney and the attorneys for many of the large lease owners * * * hold a substitute lease approved by the Department, is the only legal recourse to supply the deficiency, * * * unless it is reversed by the Supreme Court at Washington. We had recently paid the annual rental and advance royalty on the original lease due on August 8, 1922. * * * In equity to both lessor and lessees, we know of no better method of handling such a case, and, therefore, submit the leases and all facts relative to the transaction to you and ask your cooperation to legalize this lease."

The Department concluded to accept the prior lease of Sam Little for cancellation and to approve the substitute lease therefor made by Little and his wife. It treated the new lease as a substitute for the prior lease and Cromwell and Graves accepted it, with the Department's approval, as a substitute. They signed a stipulation, in negotiating with the Department, in which they stated it to be a substitute for the prior lease, and said that they asked: "The approval of this substitute lease for the unexpired time of lease No. 39351" (the prior lease). Cromwell and Graves were put to an expense of about $900 in obtaining the new lease, and from the time they got it they claimed and ever thereafter have claimed it as their property, and that the Oklahoma-Louisiana Syndicate had no title to or interest in it, and they later sold it for a large sum which they have retained and applied to their own private uses. Obviously, that claim cannot be sustained, because (1) the Supreme Court, in reversing the Court of Appeals, held in effect that the prior lease was valid—that is, the wife's signature was not needed, (2) Cromwell and

Graves accepted the new lease as a substitute lease for the prior lease, which they had assigned to the syndicate, and (3) their trust relation was such they could not deal with the subject in their private interest without first reporting the facts to their cestuis que trustent and giving them an opportunity to take or waive whatever benefits might be gotten out of the situation. And they did not notify them and the beneficiaries knew nothing of the situation, nor of the giving of the new lease, until after Cromwell and Graves had sold it in separate parcels during the year 1924. Clearly, they must account to the syndicate for at least the amount received, without deduction for commissions which they claim to have paid, and for more, if its reasonable market value was greater than the price they sold it for, at any time prior to the institution of this suit. 1 Perry on Trusts (5th Ed.) § 196, says:

"If among the assets of the trust estate there are leases, the trustee cannot renew them in his own name; and if he renews them in his own name, he must hold them by a constructive trust for the same persons beneficially interested in the old lease. Even if the lessor refuse to renew the lease for the benefit of the cestui que trust, and the trustee takes it in his own name, he is still a constructive trustee, and he must account for all the income and profits. This is on the ground that a trustee should be under no temptations to make any contracts in relation to the trust property, even collaterally, on his own private account."

See, also, 2 Perry on Trusts, § 538; McCourt v. Singers-Bigger (C. C. A.) 145 F. 103, 7 Ann. Cas. 287.

■ Graves' deposition was taken but he was not personally served in this suit, and no personal judgment can be rendered against him. However, that is no reason why Cromwell should not be held for what they both received, or the full value of the lease if that be greater. Cromwell throughout co-operated with Graves in obtaining the substitute lease, in claiming that they received it and thereafter held it in their individual right, in failing to assign it to the syndicate in the manner in which the prior lease had been assigned, in neglecting to notify their co-trustee and the beneficiaries, and finally in selling the lease without objection or protest on the part of Cromwell that it belonged to the syndicate, but with his consent and co-operation. 2 Perry on Trusts, § 848:

"If co-trustees are jointly implicated in a breach of trust, the cestui que trust may have a decree against them jointly, or he may take an execution against any one of them separately, or he may levy an execution on the property of one, as each one is liable for the whole amount."

Warne was wholly inactive as a trustee in looking after the trust estate and its interests, and took no part in and knew nothing about the taking of the substitute lease and its sale by Cromwell and Graves. No personal liability against him is claimed and no accounting asked.

■ We return to the trustees' meeting at Kansas City on July 20, 1921. The appellants claim and allege in belated amendments to their bill that the result of that meeting was to bring into the trust estate other Oklahoma oil and gas leases held by Cromwell and Graves, not named in the schedule of leases attached to the declaration of trust as constituting the trust estate, and that they should account therefor. The most valuable of these leases is the Hepsy Little lease on her 160 acres adjoining her husband's 120 acres. Warne testified that he called the Kansas City meeting to order and then "stated to Cromwell and Graves that they had not re-syndicated, developed, or sold any of the leases to bring in money to carry on the business as they had guaranteed to do, and additional to that they had allowed leases to lapse, including some that were represented as the most valuable the syndicate had * * * that unless they convinced us they would carry out some of their original promises I intended to sue them. * * * It was the Louisiana leases that had lapsed. Graves said they would substitute leases equal to or exceeding the value of those that had lapsed. * * * I inquired what leases they proposed to substitute and he mentioned a number, to all of which Cromwell agreed except the Hepsy Little, which Graves had mentioned. * * * I said to leave that one (Hepsy Little) in because it is on the structure. Cromwell then said 'If that will settle the question alright, I will put it in.' Graves and Cromwell themselves were going to raise the money to pay the rentals. That is why they sold us this stuff and we paid them thousands of dollars to have the funds to proceed to develop. They sold us this stock as absolutely non-assessable. Yes, my $5,000 subscription was for an interest in the leases before they were syndicated, but they were to develop them. There never was a word mentioned about rentals. It is true when these lapsed in Louisiana there was no money in the treasury to pay them." Warne's subscription for shares

was $5,000. He paid $3,000 and his note to Cromwell and Graves for the remaining $2,000 was still unpaid at the time he testified, though he says Cromwell and Graves were "going to raise the money to pay the rentals." He further says they were to develop the leases and "there never was a word mentioned about rentals." He says "they sold us this stuff and we paid them thousands of dollars to have the funds to proceed to develop." Other witnesses testified that Warne, at the Kansas City meeting, charged Cromwell and Graves with having failed to re-syndicate a portion of the syndicate properties so as to provide funds to run the syndicate and drill two wells, "as they agreed to do when the syndicate was formed," and that during the talk about Cromwell and Graves putting in other leases Warne said: I wouldn't accept a single lease in settlement of this unless you promised me you would proceed and syndicate, as you told me you would when we started this, and thereby provide funds." Cromwell testified there was nothing definite done about how the O-L Syndicate should be financed and rentals paid, nor as to the means or by whom the money should be raised, that he and Graves did not agree that they would finance the syndicate by the sale of leaseholds so as to operate without calling on the shareholders. Another witness testified that when the syndicate was being worked up Cromwell and Graves said they would re-syndicate and get money to care for it, that they were going to finance the O-L by re-syndicating, by drilling oil wells and selling leases. Graves testified that when the trust was created it was agreed by all the parties that money for financing the syndicate should be raised by re-syndicating a part of the property, that it was not expected the certificate holders would be called on for funds and that all agreed to assist. The shareholders thought they had friends who might be able to assist in the re-syndicating plan, that he and Cromwell proposed that plan but that when re-syndicating was attempted they could not put it through. The subscription memorandum contained no suggestion that the money paid in by shareholders should be used by Cromwell and Graves to pay rentals or to develop the property. By its terms Cromwell and Graves as shareholders were to stand on the same footing and were to be subject to the same duties and rights as other shareholders, and aside from their duties as trustees, they never in writing assumed any obligations to the syndicate. This testimony is too indefinite and confusing as a basis on which any particular duty and

liability of Cromwell and Graves can be ascertained and fixed. It contradicts the declaration of trust that expenses of administration and compensation for their services could be taken out of the trust estate by the trustees. It does not disclose the assumption of an obligation by them, but was the voicing of expectations of what might be brought about if some one or more on the outside could be induced to put their money in a re-syndication of the leases, or buy some of them, or sublease and develop some of them, and thus take the risk in what all knew was a speculative scheme, to the possible benefit of the O-L Syndicate. It is plain that Cromwell and Graves did not agree when the syndicate was formed or at any other time, to take the chance of losing their money by personally doing those things. They were to re-syndicate or sell leases or sublet, which meant they were to try to induce others to take the chance, and their testimony, the circumstances and surrounding conditions convince that those things could not be accomplished. No one was or could be found to take that chance. The plain fact is that everyone in the O-L Syndicate knew the hazards and they were all anxious to find some plan that would induce others to assume those hazards rather than take them themselves. Cromwell and Graves were oil men and it was thought they were best fitted to do the persuading. They tried it and failed. We see no breach of duty on their part personally or as trustees, in these respects, as charged by Warne and others at the Kansas City meeting. It is argued that forbearance to sue on the accepted condition that the Hepsy Little lease be put into the trust constituted a valid contract and Cromwell and Graves are bound to account for the Hepsy Little lease and other leases, of far less value, which, appellants contend, they agreed at the same time to put into the trust. We are not advised that the law regards a wholly baseless charge and a waiver of its prosecution as a legal consideration for a compromise agreement. Others at the meeting corroborated Warne that Cromwell finally agreed, under Warne's threat to sue, that he and Graves would put the Hepsy Little lease in the O-L trust. The other witness who was most insistent in that regard was sorely contradicted by his subsequent conduct and statements. Cromwell and Graves denied there was any conversation or statement at the meeting about the Hepsy Little lease. They said it was not mentioned. They testified without contradiction that they had done all that they could do to sublease without success. They admitted that they

agreed to put other leases owned by them into a re-syndicating pool, so as to make up a total of about 1,000 acres, including some 700 acres or more of leases in Oklahoma then owned by the Oklahoma-Louisiana Syndicate, that a half-interest in all of these should be assigned to the re-syndicating pool or trust and shares therein sold until $50,000 was raised to drill two oil wells, that it was agreed at the meeting those interested in the Oklahoma-Louisiana Syndicate would assist in selling these shares. They went home and immediately took steps to carry out that plan, and of date July 25 1921, a circular letter addressed to the shareholders of the Oklahoma-Louisiana Syndicate, with the names of the three trustees subscribed thereto, was sent to the O-L Shareholders, wherein were stated the terms and purposes of the proposed re-syndication, and in which the oil leases on 1,000 acres in Oklahoma were described by legal subdivisions and the counties named in which the several tracts were situated. The land on which the Hepsy Little lease was given was not described therein, but the land on which Cromwell and Graves individually held other leases was described therein. No shareholder at the Kansas City meeting, nor those who were not there, made any objection that the Hepsy Little lease was not named in the circular letter as one of the leases which Cromwell and Graves were to put into the re-syndicating trust. Cromwell and Graves then prepared the re-syndicating papers. These documents recited that a contract had been made by Warne, Graves, and Cromwell as O-L trustees with the Guaranty Trust Company as trustee for Muskogee-Tulsa O. & G. Syndicate, to the effect that unit holders of the M-T Syndicate, through its trustees, are purchasing an undivided one-half interest in 1,000 acres of leases and two test wells were to be drilled thereon, in consideration of $50,000, which contract with the assignments of said one-half interest are held in escrow by the Trust Company pending collection and payment of the $50,000, and that the Trust Company agrees to permit O-L agents to retain 35 per cent. of the collections from sales in the M-T Syndicate. This venture proved a failure. Cromwell and Graves, by their efforts, were able to raise only $1,200 of the proposed $50,000. The shareholders in the Oklahoma-Louisiana Syndicate did not sell any units in the Muskogee-Tulsa O. & G. Syndicate, and Cromwell

and Graves, on the failure, returned the $1,200 to the subscribers. On failure of the re-syndication Cromwell and Graves took back the three leases owned by them individually, which they had turned over to the Guaranty Trust Company in escrow, and they took back as trustees the leases placed in escrow with that company that belonged to the Oklahoma-Louisiana Syndicate. As before said, they denied that they agreed at the Kansas City meeting to put any of their individual leases into the Oklahoma-Louisiana Syndicate, but they admitted that they did agree to put some leases held by them individually into the re-syndicating trust, and they did so, and that trust wholly failed. We think the facts and circumstances that have been stated sustain their testimony and contentions in that respect. When the Oklahoma-Louisiana Syndicate was created a schedule of the leases put into that syndicate by Cromwell and Graves was attached to the declaration of trust, and if they had agreed at the Kansas City meeting to put additional leases into that trust, including the Hepsy Little, it is a circumstance of weight against the appellants' contention that neither Warne nor any other shareholder at that meeting asked that a description of those leases should be put in writing and added to the schedule attached to the declaration of trust. Moreover, if any such promise had been made it would have been a pure gratuity and Cromwell and Graves were not bound thereby.

It was stipulated at the trial that the issue of accounting should be reserved until the issue as to the liability of Cromwell and Graves to account should be first determined. The decree dismissing the bills, except as to defendants oil companies, will be reversed and the cause remanded to the district court to take that accounting as to the Sam Little lease, and to ascertain the shareholders in the Oklahoma-Louisiana Syndicate for the purpose of making distribution among them. The only credits to be allowed in favor of Cromwell against the full amount for which the Sam Little lease was sold, or its reasonable value, are the rentals paid on syndicate leases by Cromwell and Graves. Any unpaid stock subscriptions will be credited to Cromwell and Graves. Costs of this appeal will be adjudged against Cromwell. The dismissal of the bill against the three corporate defendants is affirmed. As to all other parties it is reversed and remanded.