KILGORE<br>*v.*<br>GREVEMBERG.

nearly across the defendants' plantation; said ditches and canals to be closed and filled up at the point only where they are cut through said ridge of land herein indicated; and that it is further ordered that the long ditch or canal on or near the defendants' lower line, be closed at the point where the extension of said ridge would fall across said ditch at right angles; and it is further ordered that, if need be, a writ of *distringas* issue to enforce this judgment; and that the judgment of the lower court, as amended, be affirmed, and that the defendants pay the costs of both courts.

---

## GOURDAIN & KERR *v.* C. B. BAYLIES et al.

10 691<br>109 100<br>—<br>10 691<br>111 773

Where a sale is attacked as simulated, and a *prima facie* case of simulation made out, and the purchaser fails to offer rebutting testimony to show that he actually paid anything for the property, the sale will be decreed to be simulated.

APPEAL from the District Court of St. Mary, *Voorhies*, J.

*J. G. Olivier*, for plaintiffs: Cited C. C., 1980, 1975, 1979, 1984, 2628 ; 2 N. S., 61 ; 2 L. R., 16 ; 6 Ib., 538 ; 7 Ib., 16 ; 4 Ib., 254 ; 6 An. R , 646.

*Al. Tucker* and *T. H. Lewis*, for appellants: Cited C. C., 1965, 1973, 1974 ; *Bauduc* v. *His Creditors*, 4 L. R., 254 ; *Syndic of McManus* v. *Jewett*, 6 L. R., 538 ; 16 L. R., 150 ; 9 L. R., 171.

SPOFFORD, J. We concur with the District Judge in the opinion that the evidence offered by the plaintiffs rendered the sincerity of the sale from *Baylies* to *Nash* so improbable, that a *prima facie* case of simulation was made out; the failure of the defendant, *Nash*, to rebut the case thus made, by competent evidence that he had actually paid anything for the slaves he pretended to purchase, justified the court *a quo*, under the pleadings, in subjecting the slaves in question to be seized and sold to satisfy the plaintiffs' demand. See *Birdsdale* v. *Lakey*, 6 An., 647.

The judgment is therefore affirmed, with costs.

---

## JAMES SMITH'S EXECUTOR *v.* H. C. DWIGHT.

A transfer of the title to slaves, accompanied by the delivery of the counter-letter, in which the vendee engages to resell to his vendor the slaves, on the payment, by the latter, of the expenses of the keeping and maintenance of the slaves, and other claims against him, and where the vendee, by acts and declarations, represents himself as the agent of the vendor, and renders accounts, annually of the hire of the slaves, etc., *Held:* not to be a *vente à réméré*, but a simulation.

In a *vente à réméré*, the real title passes, subject to a defeasance within a limited term. The vendee is entitled to the fruits, and is responsible for the expenses of the property.

APPEAL from the District Court of St. Mary, *Voorhies*, J.

*Ed. Simon*, for plaintiff. *J. G. Olivier* and *T. H. Lewis*, for defendant and appellant.

SPOFFORD, J. In 1844, the slaves which are in controversy in this suit were seized, under execution against Dr. *James Smith*, as his property, and, on the 10th December, 1844, adjudicated to *James Porter*. It appears, however, that they

SMITH
v.
DWIGHT.

went into the possession of the defendant, *Henry C. Dwight*, under an understanding between *Dwight*, *Smith* and *James Porter*. This understanding is proven by a letter of *Dwight* to *Porter*, dated 20th May, 1845, and the subsequent conduct of all the parties.

In the letter referred to, *Dwight* requested *Porter* to convey the negroes to himself, according to the wishes of *Smith*. On the 9th of August, 1845, *Dwight* wrote to *Smith*, giving him a full detail of the mode in which he was hiring out the negroes, and advising with him as if he were still their owner. On the 18th May, 1846, *Porter* executed an act of transfer of these slaves to *Dwight*, without warranty, except against himself, and those claiming under him. On the 1st June, 1846, *Smith*, by authentic act, relinquished in favor of *Dwight* all right of redemption, as well as all claim he ever had in or to the slaves. This act was preceded by what is called a counter-letter, *sous seing privé*, couched in the following terms:

"Dr. *James Smith*, having this day, by act passed before ——————————, relinquished to me, for the price and sum of $7923 55, paid to him this day, all his right, title and claim to the redemption of certain negroes purchased by me from *James Porter*, by act passed before *J. A. Dumartrait*, Parish Judge, on the —————— day of May; now, be it known, that I hereby engage and bind myself to sell the said negroes to the said *Smith*, on the following conditions: First, on his paying all costs, charges and expenses for the support and maintenance of said negroes. Second, on his repaying me the sum of $7923 55, which I have this day paid to him for the relinquishment, with eight per cent. interest annually from the first of April last. Third, on his paying me $4000, with eight per cent. interest annually from the 15th May, 1845, it being the amount I paid *James Porter* for the purchase of said negroes. Fourth, on his paying me the amount of any judgment, note or claim I may have hereafter transferred to me against him, with eight per cent. interest annually from said transfer, or such rate of interest as said claim may draw if over eight per cent.

Parish of St. Mary, May 30th, 1846.

Signed,          HENRY C. DWIGHT."

On the 1st June, 1846, the day of the renunciation before alluded to, *Dwight* receipted to *Smith* for $1900, "towards the amount to be paid for the redemption of the negroes purchased of *James Porter*."

On the 10th June, 1847, *Dwight* wrote to *Smith*, advising him to make a will, lest his estate fall into the hands of a stranger who "might upset the arrangements they had made," and recommending himself as a suitable person for an executor, "capable of working it out, and leaving something for *Smith's* children."

On March 6th, 1848, *Dwight* wrote to Mr. *Hall*, a creditor of *Smith*, about the claim which he afterwards settled, and which he stated, if prosecuted, would leave Dr. *Smith* "without any of his negroes."

During the years 1845, 1846, 1847 and 1848, *Dwight* kept debtor and creditor accounts, which would seem to have been annually rendered to *Smith*, as they were found among his papers, and produced by his administratrix, (who is now plaintiff, Dr. *Smith* having died pending the suit.) In these accounts, *Smith* is charged with all the moneys paid out by *Dwight* for his account, the sums paid his creditors, the sums paid *Porter* upon the transfer of his title to the slaves, the taxes, etc., including a charge of $500 annually for his own services in hiring out the slaves in question. On the credit side of the accounts are large sums received for the hire of the negroes, etc.

It is also proved by witnesses, whose evidence was received without objection, that during many years, commencing with 1845, the defendant hired out the negroes, and represented himself as *Smith's* agent in so doing, and in collecting the hire.

In no respect did his relations towards *Smith,* as thus disclosed, appear to have changed for several years after he took the paper title in June, 1846.

On the 16th January, 1852, *Smith* instituted the present action against *Dwight,* in which he alleged that, under the facts stated in his petition, the contract between himself and the defendant was, in substance and legal effect, a contract of *antichresis,* the slaves being pledged to *Dwight* for a mere loan of money, and not absolutely sold, the paper title having been given to him as a security for the money advanced, imposing upon him the obligation of accounting for the proceeds of the hire and labor of the slaves, to be applied to the extinguishment of the interest and of the principal of the debt, and entitling the petitioner to the recovery of any excess over said debt. The petition also declares that *Dwight* had latterly refused to account, as he was bound to do, for the hire of the slaves, or to re-deliver the same to the plaintiff, although the whole of the debts, which he may have owed under the contract, had been satisfied, and there was a surplus due to him.

The defendant answered, that the sale to himself from *James Porter* was an absolute and unconditional sale. He admitted that he signed and delivered to plaintiff an instrument in writing, by which he agreed and bound himself, on the conditions therein stipulated, to sell to the plaintiff the property therein mentioned, and averred that he had always been ready to perform the stipulations contained therein, but that the plaintiff had never offered to comply on his part. He specially denied that the said instrument was an *antichresis* or counter-letter, asserting it to be an independent contract, only binding upon the parties thereto according to its tenor.

The plaintiff having died, the suit was revived in the name of his widow and administratrix, who produced the accounts before referred to, not admitting their correctness on the debit side, but to show the construction which the defendant himself had put upon the contract between himself and her deceased husband; she prayed that the property sued for be adjudged to belong to the estate of the deceased, and be put in her possession, to be disposed of in due course of administration for the benefit of the creditors, etc.

There was judgment recognising the plaintiff as the owner of the slaves in dispute, reserving to the defendant whatever rights he may have on them under the contract of antichresis.

The defendant has appealed, and the plaintiff, in answer to the appeal, has prayed for a formal amendment of the judgment.

The ground assumed by the defendant's counsel in this court, in his oral argument, was, that the contract between the parties was a *vente à rémeré,* and that the plaintiff having failed to comply with the only conditions upon which the faculty of redemption was granted, his petition should be dismissed.

Looking only to the instrument styled a counter-letter as the repository of the intentions of the parties, we should, nevertheless, be compelled to say that the contract lacked some of the essential features of the sale *à rémeré.*

But it would be taking too narrow a view of the mutual obligations of the parties to derive them from this instrument alone, as the defendant seeks to do. On its face, the document refers to other documents, and to collateral facts which

are absolutely necessary to be known, in order to relieve the instrument in question from obscurity. The evidence that has been received without objection, gives us an insight into the meaning of the parties. The letters of *Dwight*, before and after his pretended purchase, and especially his accounts rendered to *Smith*, are written evidence of as high authority as the counter-letter itself, and must be considered in connection with it in searching for its proper interpretation. The acts of *Dwight* also furnish a practical commentary upon the contract; and, as no objection has been made, his oral admissions, coupled with his conduct, may be taken into account in construing the instrument to which alone he wishes to confine the attention of the court, and which, without the light of extraneous circumstances, would be hopelessly ambiguous.

Looking, then, at all the facts and documents in evidence, it is most manifest that there was no sale *à réméré*. *Smith* never sold the property to *Dwight*. In the authentic act, he pretended to sell his right of redemption, but in the counter-letter, *Dwight* annulled even that sale. As between *Smith*, *Porter* and *Dwight*, the title really never went out of *Smith* at all, for there was an understanding between them all that the purchase at Sheriff's sale, under execution against *Smith*, should hold the property for the benefit of *Smith*, to pay off the debts for which he was liable. Thus we see that when *Porter* bid in the slaves, he did not take possession, as he would have done if he had purchased for himself, but they were delivered to *Dwight*, the active friend and adviser of *Smith*, who immediately (though without even an apparent title himself,) commenced to administer the property, and to pay off debts of *Smith*, accounting to the latter for the hire and charging him with the expenses and payments made, and even charging him with an annual salary for his services in this behalf.

About eighteen months after he had commenced this administration, he took a transfer of *Porter's* apparent title, and then procured the renunciation of *Smith*, and gave him the counter-letter. But all this produced no change in the actual relation of these parties to each other. Notwithstanding this pretended acquisition of title, *Dwight* continued to render his annual accounts to *Smith* as before, and to treat the slaves in all respects as *Smith's*.

In a sale with the right of redemption, the real title passes to the vendee, and for a fixed price. A term is limited, (which cannot exceed ten years,) within which alone the vendor may defeat the sale by the repayment of the price. Meanwhile, and before the exercise of this faculty, the vendee, with that single reservation, is the owner; the fruits belong to him; he owes no account for them; he pays the incidental expenses of the property as an owner.

By his uniform course of dealing for several years, by his letters, and his repeated admissions, *Dwight* is precluded from asserting that he made a *bona fide* purchase of the slaves in question, under the right of redemption reserved to *Smith*.

This is sufficient to dispose of the appellant's pretensions, and we concur with the District Judge that it is not material for the plaintiff to show, in support of the decree prayed for, that the contract of the parties was strictly and technically an *antichresis*.

When we survey the whole history of the case, we perceive that the counter-letter itself is in part a simulation; that it is one link in a series of simulated titles, the end and object of which was the better to enable *Dwight* to pay off the debts of *Smith* out of the revenues of the slaves taken in execution in 1844, and to save the slaves themselves for *Smith* or his family. Less laudable motives may

have intervened on the one side and on the other. We see no positive evidence in the record that *Smith* designed to injure his creditors, and the administratrix who is now plaintiff, representing in that capacity the creditors, expressly seeks to recover the property for the purpose of paying the debts. For several years *Dwight* appears to have manifested a willingness to carry out his part of the contract, as mutually understood, keeping the paper title only as a security against loss for advances made for the benefit of *Smith*, for which he charged the highest rate of conventional interest, but in all respects treating *Smith* as the real owner of the property.

Before the suit was brought, however, he appears to have changed his attitude, and to have discontinued the rendition of his annual accounts. His answer to the petitioner evinces that he is now disposed to recant his most solemn admissions, to break his faith, to despoil both the heirs and the creditors of the man whom he approached in the garb of a confidential friend, and to claim as his own the property he received in trust for others.

The law everywhere frowns upon such conduct as this, and interposes its arm to prevent the perpetration of such fraud. In equity, the defendant, under the facts of this case, would be decreed to have held the property in trust for *Smith*, and would be compelled to account fully for the fruits.

The powers of our courts are, in this respect, equally extensive. It is probable, from his own account, that the defendant has been more than paid for all his advances, and is really in debt to the succession of *Smith*. If it were not so, it was easy for him to show it, and the fact that he has rendered no account since 1848, although the slaves, with their valuable revenues, have hitherto continued in his possession or under his control, is to be construed against him.

Under all the circumstances, we are of opinion that the plaintiff and appellee is entitled to the amendment she prays for in her answer to the appeal.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be amended, and the defendant be ordered to deliver the property in controversy into the possession of the plaintiff, *Mary G. Hill*, in her capacity as administratrix of the succession of *James Smith*, to be administered upon according to law; it is further ordered, that a writ of possession may issue upon this portion of the judgment, after the filing of this decree in the court below; and it is further ordered, that the cause be remanded to the District Court for a final adjustment of the accounts between the parties growing out of the possession of the property by the defendant in trust for the plaintiff; and it is decreed, that in other respects, the judgment of the District Court be affirmed, the costs of this appeal to be borne by the the the defendant and appellant.