## H. N. FINE *et al. v.* J. W. LAWLESS *et al.*

### (*Knoxville.* September Term, 1917.)

1. **GOOD WILL.** Nature of right. Protection.

"Good will" is property in the sense of being a thing subject to be damaged, and an injunction will lie to protect it when the seller of the good will thereafter wrongfully interferes with it or the property conveyed of which the good will is an incident. (*Post, pp.* 165-171).

Cases cited and approved: Crutwell v. Lye, 17 Vesey, 335; Moreau v. Edwards, 2 Tenn. Ch., 349; Christian v. Douglass, Johns. Eng. Ch., 174; Sanford-Day Iron Works v. Enterprise Foundry, etc., Co., 138 Tenn., 457; Bradford v. Furniture Co., 115 Tenn., 610; Jackson v. Byrnes, 103 Tenn., 698; Spiess v. Rosswog, 63 How. Prac. (N. Y.), 401.

Cases cited and distinguished: Slack v. Suddoth, 102 Tenn., 378; Munsey v. Butterfield, 133 Mass., 492; Wentzel v. Barbin, 189 Pa., 502; Lee v. Vernon, 5 Brown's Parl. Cases (10 Ed.), 1803; McCourt v. Singers-Bigger, 145 Fed., 103; Clegg v. Fishwick, 1 Mac. & G., 294.

2. **GOOD WILL.** Sale. Stipulation.

Upon a sale of the good will of a business without more, the seller is not precluded from setting up a precisely similar business at another stand in the same locality, and if the purchaser desires to forestall such step he must expressly stipulate against it. (*Post, pp.* 165-171).

3. **LANDLORD AND TENANT.** Renewal. "Tenant-right of renewal."

While a tenant in possession whose lease contains no provision for renewal cannot compel a renewal, nevertheless he has such a likelihood of procuring a renewal, which is called a "tenant-right of renewal," that equity will protect it. (*Post, pp.* 165-171.)

4. **GOOD WILL.** Sales. Protection. ''Tenant right of renewal.''

Where the seller of a business conducted in demised premises assigned the lease and conveyed the "good will," which includes the possibility that old customers will resort to the place and any other positive advantage acquired arising out of the business of the old firm whether connected with the premises where it was carried on or with the name of the late firm; the seller is under an implied obligation not to interfere with the purchaser in his use of the business premises and control of the lease assigned, for that constitutes a part of the good will, and hence, as the purchaser by reason of the assignment of the lease acquired what is known as a "tenant-right" in respect to renewal of the lease, which is the likelihood of a tenant obtaining a renewal though the lease contains no such provision, it was a breach of good faith for the seller during the existence of the lease to obtain a new lease running to him to commence on expiration of the one assigned. (*Post, pp.* 165-171.)

5. **TRUSTS.** Constructive trusts. Establishment.

Where the seller, who assigned the lease of the demised premises in which the business was conducted before expiration of that lease, obtained from the landlord a lease running to him which was to commence at its expiration, the seller was guilty of such bad faith that equity will require him to hold the lease as a constructive trustee for the benefit of the purchaser who was the assignee of the first lease. (*Post, pp.* 171-174.)

Cases cited and distinguished: Holt v. Holt, 1 Ch. Cas., 190; Mitchell v. Reed, 61 N. Y., 123; Bennett v. Vansyckel, 11 N. Y. Super. Ct., 462; Crook v. Crook, 20 Abb. N. C. (N. Y.), 249.

6. **TRUSTS.** Constructive trusts. Defenses.

In such case, refusal of the landlord to renew the lease to or for the benefit of the purchaser of the business, to whom the first lease was assigned, does not entitle the seller to take a renewal for himself or defeat the constructive trust, for a rule to that effect would open the door to collusion. (*Post, pp.* 175, 176.)

Case cited and approved: Neal v. Cox, 7 Tenn., 443.

139 Tenn.—11

Case cited and distinguished:  Keech v. Sandford, Cas. T. King, 61, 15 Eng. Rul. Cas., 455;  Davoue v. Fanning, 2 Johns. Ch. (N. Y.), 252.

7. **TRUSTS.** Constructive trust. Leases. Assignment.

Though both the lease assigned to the purchaser and the one obtained by the seller declared that it should not be assigned or transferred by the lessee or by operation of law without written consent of the owner does not prevent the purchaser from insisting on the establishment of such constructive trust, he cannot by that means force the owner to accept him as a tenant and allow him to occupy the premises. (*Post, pp.* 176, 177.)

8. **LANDLORD AND TENANT.** ''Unlawful detainer.'' Right to maintain.

Under Thompson's Shannon's Code, section 5093, declaring that "unlawful detainer" is where the defendant enters by contract either as tenant or assignee and willfully and without force holds over the possession from the landlord or the assignee of the remainder or reversion, a landlord may maintain an action to dispossess a subtenant or assignee holding over, notwithstanding such landlord had lost control of the reversion by demising the premises to another for a term to commence at the expiration of the term of the holding over tenant. (*Post, pp.* 177, 178.)

Cases cited and approved: McNairy v. Hicks, 62 Tenn., 378; Manley v. Rodgers, 13 Tenn., 217.

Code cited and construed:  Sec. 5093 (T.-S.).

---

· FROM HAMILTON.

---

Appeal from the Chancery Court of Hamilton County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—W. B. GARVIN, Chancellor.

THOMPSON, WILLIAMS & THOMPSON and J. L. LEVINE, for appellants.

COOKE & NOLL and T. S. MYERS, for appellee.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

The bill was filed by Fine (and by his former partner for Fine's use) against Lawless Bros., a copartnership, to restrain by injunction the defendant firm's interference with complainant Fine in the enjoyment of the good will of a business sold to him along with the stock of goods, which business for many years had been conducted by Lawless Bros., at 222 Main street in the city of Chattanooga; and praying to be protected by injunctive process in the matter of a lease of the storehouse which at the same time was transferred to Fine and partner as purchasers of the stock of goods then in the building. Fine, by purchase of his partner, is now the sole owner of the property so acquired.

It appears that Lawless Bros., in January, 1911, entered into a lease contract with the owner of the property, Mrs. A. A. Strong, for a term of five years. Before its expiration, January 1, 1916, to-wit, on August 11, 1913, this lease was assigned to Fine and his associate; but the last-named will not be referred to in the subsequent statement and discussion for the reason noted above.

Lawless Bros. opened up in the same line of business at 252 Main street, without objection or complaint on the part of complainant Fine.

The contract of sale by Lawless Bros. contained these conveying clauses which follow recitations as to the transfer of the stock of merchandise and fixtures:

"2. The lease which the said Lawless Bros. now have on the lot and store building at No. 222 East Main street, together with all rights thereunder.

"3. The name 'The Wonder Store' under which the business has been and is now being conducted, together with the good will of that name and the business."

Mrs. Strong assented in writing to the transfer of the lease to Fine who, it was recited, was "to have the same rights under the original lease as are granted to Lawless Bros.," and the firm made a formal transfer of the lease.

On June 12, 1916, Fine wrote a letter to Lawless Bros., stating that he had learned of negotiations on their part for a lease of the Strong premises, and protesting against the effort to "upset" him notwithstanding a promise made to aid the writer to get a renewal of the lease; and he stated that the effort to defeat him was an outrage.

Lawless Bros. proceeded, notwithstanding, to close a lease in August, 1916, identical as to terms with the old one. On October 18, 1916, while Fine's term was yet running under the assigned lease, the defendant firm announced to the public in a full page advertisement of a "removal sale" in the Daily News: "We're going back to our old home!" Incorporated in the advertisement as an "indisputable fact" was the

statement that the firm was going to change their location of business to 222 Main street—"the old stand they occupied for years"—and "submarine prices on everything" were quoted.

Mrs. Strong was also made a defendant and a suit, brought by her to dispossess Fine after January 1, 1916, was sought to be enjoined as one intended to aid Lawless Bros., in getting possession of the store-house in violation of their contract with Fine.

The chancellor sustained a demurrer of Mrs. Strong, and that ruling was affirmed by the court of civil appeals.

The further rulings and the assignment of error in this court, so far as they are material, are sufficiently indicated in the discussion which follows. We shall not detail them otherwise.

I. As to the rights of Fine against Lawless Bros.:

The doctrine of "good will" has proven to be so salutary in effecting just results that it has been constantly expanding, with the result that the definition of the word itself has been broadened as the doctrine has developed. This was noted in *Slack* v. *Suddoth,* 162 Tenn., 375, 52 S. W., 180, 45 L. R. A., 589, 73 Am. St. Rep., 881, where it was said:

"It is difficult to define what 'good will' is. Lord Eldon said that it was simply 'the possibility that the old customers will resort to the old place.' *Crutwell* v. *Lye,* 17 Vesey, 335; *Moreau* v. *Edwards,* 2 Tenn. Ch., 349. But in *Christian* v. *Douglass,* Johns. Eng. Ch., 174, it was said that this was too narrow a

view to take of it, and there it was said that it was every positive advantage acquired, arising out of the business of the old firm, whether connected with the premises where it was carried on, with the name of the late firm, or with any other matter carrying with it the benefit of the business of the old firm.''

All definitions incorporate as one of the chief elements of good will the advantage accruing to a vendee from the old business stand—the feature we have here to deal with. It does not appear that Lawless Bros. made any effort to use the old name, ''The Wonder Store,'' after selling to Fine.

''Good will'' is property in the sense of being a thing subject to be damaged and entitled to the protection of the law (*Sanford-Day Iron Works* v. *Enterprise Foundry, etc., Co.,* 138 Tenn., 457, 198 S. W., 258), and an injunction will lie to protect it, when the seller of the good will thereafter wrongfully interferes with it or the property conveyed to which the good will is incident. 12 R. C. L., p. 995, and cases cited; *Bradford* v. *Furniture Co.,* 115 Tenn., 610, 633, 92 S. W., 1104, 9 L. R. A. (N. S.), 979.

When Lawless Bros. sold the good will of the business and transferred their current lease of the business stand, good faith required that they should not thereafter do anything which should tend to deprive their vendee of the benefits and advantages incident thereto.

A distinction may here be noted which will aid in the determination of the rights of the parties litigant.

Upon a sale of the good will of a business, without more, the selling party is not precluded from setting up a precisely similar business at another business stand in the same city, or even in the vicinity. If the purchaser desired to forestall such a step, he must expressly stipulate against it in the contract. *Jackson* v. *Byrnes,* 103 Tenn., 698, 54 S. W., 984; 20 Cyc., 1279.

But, without such a stipulation, the seller of a business and its good will is precluded from interfering with the purchaser in the enjoyment of the particular business stand which is transferred by him to the purchaser. There is implied in the contract of sale the agreement that the purchaser will not be disturbed by the seller in his right to enjoy all advantages that inhere in the premises used as the place of business. By implication of law the contract binds the seller not to do any act that would prevent the vendee's use of the stand, and all advantages incident to it, to the same extent and in the same way the vendor himself might have done but for the sale.

Decisions which deal with interference by the seller with business locations passing without such a stipulation but as a part of the good will are no means numerous. The few, however, clearly make the distinction we have adverted to—that it does not require express terms to prevent the seller from derogating from his grant of good will incident to business premises.

*Munsey* v. *Butterfield,* 133 Mass., 492, involved a contract for the sale of a milk route.    It was there said:

"A material part of the property to be delivered was, as stated in the agreement, 'the good will of said Munsey's milk route lying in West Somerville, East Somerville, North Somerville and Charlestown.' This contract, called a sale of the good will of Munsey's milk route, was really, like a sale of the good will of any business, an agreement by the plaintiff that he would retire from it, and would allow the defendant to enjoy the benefits and advantages of it, and would do nothing to impair or injure it. This agreement was implied in the transaction, and in fact constituted the contract of sale of the good will of the milk route on the part of the plaintiff.".

In *Wentzel* v. *Barbin,* 189 Pa., 502, 42 Atl., 44, where a paper route was sold and the vendor went over the route soliciting patronage which was formerly his, it was said:

"When the defendant agreed to sell to the plaintiff 'all his right, title and good will to the Oakland paper route, until now controlled by the said R. M. Barbin,' he became bound in honor and in law to carry out his contract in good faith. He was certainly not at liberty, especially after receiving a large part of the purchase money, to filch away from the plaintiff the veritable substance of that which he had sold. It was not like the setting up of another

business of the same kind, but it was the taking away of the very thing he had sold that was complained of by the plaintiff.

The firm of Lawless Bros. was therefore under the implied obligation not to interfere with Fine as the vendee of their good will in his use of business house and control of the lease during the period and the entire period of time covered by the assigned lease. But this does not mean that they had a right to negotiate for themselves, during that time, a renewal which would be valid simply because it should take effect at the expiration of the assigned lease.

One of the incidents and advantages of the good will of the business sold to Fine, as well as of the lease transferred to him, was that of the opportunity or chance to obtain for himself, as tenant in possession, a renewal of the lease covering such future term. It is true that the orginal lease contained no stipulation for a privilege of renewal in favor of the tenant, and it is furthermore true that neither Lawless Bros. nor Fine had any legal right to demand of the landlord a renewal on expiration.

However, courts of equity have long been accustomed to treat the tenant in possession as having an advantage or *quasi* right, called "tenant-right," in respect of the renewal of his lease. He has an interest, less than an estate or legal right, which equity recognizes as having substance and value and which it will protect. This principle was contended for in an able argument by Sir FRANCIS HARGRAVE

in *Lee* v. *Vernon*, 5 Brown's Parl. Cases (10 Ed.), 1803, which was followed by the court. He said:

"It has long been an established practice to consider those who are in possession of lands under lease . . . as having an interest beyond the subsisting term, and this interest is usually termed the tenant-right of renewal, which, though according to language and ideas strictly legal, is not any certain, or even contingent, estate, but only a chance, there being no means of compelling a renewal, yet is so adverted to in all transactions relative to leasehold property, that it influences the price in sales, and is often an inducement to accept of it in mortgages and settlements. . . .

"This 'tenant-right' of renewal, as it is termed, however imperfect or contingent in its nature, being still a thing of value, ought to be protected by courts of justice, and when those who are entitled to its incidental advantages, whether by purchase or other derivation, are disappointed of them by fraud, imposition, misrepresentation, or unfair practice of any kind it is fit and reasonable that this injury should have redress."

In *McCourt* v. *Singers-Bigger*, 145 Fed., 103, 76 C. C. A., 73, 7 Ann. Cas., 287, it was said:

"The likelihood of being able to secure such an extension under like circumstances is so great that it has come to be recognized as a valuable incident to the tenant's estate, a species of property which the law protects."

The modern cases which enforce this doctrine are collated, and the principle incorporated in the text, in 16 R. C. L., p. 903.

Sometimes the same equitable end has been reached, and protection to the *quasi* right of the tenant afforded on the concept that the old lease in a sense gives birth to the new one, and that therefore the holder of the orginal lease has a claim to such protection by the courts.

Thus, Lord Chancellor COTTENHAM, in *Clegg* v. *Fishwick,* 1 Mac. & G., 294, 41 Eng. Reprint, 1278, says that:

"The old lease was the foundation of the new lease, the tenant-right of renewal arising out of the old contract giving the partners the benefit of the the new lease."

And in *Spiess* v. *Rosswog,* 63 How. Prac. (N. Y.), 401, affirmed 96 N. Y., 651, it was said that the so-called expectation of renewal is a part of the value of a lease. "This is deemed so actual and vital that when a new lease is had it is considered to be a graft upon the old."

Possessed as Fine was of this measure of right in the eyes of equity, has the defendant firm disregarded and invaded it so as to call for equitable intervention?

The chancellor thought not, and in his final decree so held, but expressed dissatisfaction that he could not rule to the contrary and be justified by authority. He expressed, in distinct terms, the view that Lawless

Bros. were not "morally right in getting for themselves a renewal of the lease." The court of civil appeals in its opinion states that "it is inequitable for Lawless Bros. to retake that which they sold."

The decrees of the lower courts in dissolving the injunction originally issued and allowing that firm to take the benefits of the renewal lease and use the storehouse are based upon a misconception. The arm of equity is not too weak to reach to and remedy that which is inequitable and more—a fraud upon the rights of Fine. If precedents were lacking, the time is ripe for the making of one; but they are not lacking.

Since the expectancy or chance of renewal in favor of Fine as the holder of the current term is regarded in equity as a valuable interest, the doctrine from an early date has been that Lawless Bros., standing in at least a *quasi* fiduciary relation to him (under obligation not to interfere with him in the exercise of the "tenant-right"), may not secure for that firm and hold against him a renewal. The new lease will be treated as held in trust for Fine, as the person having the beneficial interest in the foundation lease upon which the renewal might have been grafted.

This doctrine of so holding in trust was first announced in 1670 in the case of *Holt* v. *Holt,* 1 Ch. Cas., 190, and it has been consistently followed both in England and in this country. 16 R. C. L., p. 904, and cases cited. Referring to the fairly analo-

gous instance of renewal of a lease by one partner for his own benefit of a lease held by his firm, it is said in this recent work:

"The lease so taken inures to the benefit of the firm, the partner taking it holding as a constructive trustee. When the lease is held by a partnership, the chance or opportunity of renewal is in itself a distinct asset of the partnership in which all the partners have an interest; and where the partnership is for a limited time it is nevertheless held that one partner has no right as against his copartner to take a new lease to commence after the expiration of the partnership by its own limitations."

As expressed in *Mitchell* v. *Reed,* 61 N. Y., 123, 19 Am. Rep., 252:

"The defendant was in possession as a member of the firm, and the firm *owned the good will for a renewal,* which ordinarily attaches to the possession. . . . He must hold them for the firm." (Italics ours.)

The doctrine is not confined to cases where leases are renewed by persons occupying fiduciary relations, in the strict sense. We have been cited; and our investigation has discovered, no case decided by a court of last resort in which it has been applied to a lessee who in similar circumstances has assigned for the balance of his unexpired term.

In *Bennett* v. *Vansyckel,* 11 N. Y. Super. Ct., 462, it was held that, where a lessee sublets with an express agreement that the sublessees should have the benefit

of the good will of the lease, a secret renewal by the original lessee (the sublessor) taken from the landlord inures to the benefit of the sublessees; and in *Crook* v. *Crook*, 20 Abb. N. C. (N. Y.), 249, it was ruled that, where a lessee assigned his lease to another who conducted his business on the demised premises, a renewal taken by the orginal lessee in his own name prior to the expiration of the lease must be held as in trust for his assignee.

It cannot be, on considerations of common honesty, that a transfer of the good will, embracing an assignment of the lease, will admit of the seller's "running under" him whose money he has taken, and ousting him of a substantial part of that which was conveyed. The chance or opportunity to procure a renewal may not be taken away from such a purchaser at any time pending the transferred term. During the whole of that term Fine's tenant-right to renew was not to be subverted by the sellers. As said in *Bennett* v. *Vansyckel,* supra, in speaking of the assignor:

"In respect of the good will, he was, in the full sense of the term, their (the assignee's) trustee; nor could he strip himself, without their assent, of the relation and its duties. It is true, he was not bound to take a new lease in his own name, for their benefit, but, without their consent, it was only for their benefit that he could take it all. . . . It was a breach of good faith, and of the trust and confidence which the plaintiffs reposed in him, and was therefore, according to the established doctrine of equity, a fraud, the fruits of which he cannot be permitted to retain."

Fine v. Lawless.

Even the refusal of the landlord to renew the lease to or for the benefit of such *cestui que trust* does not, necessarily or ordinarily, entitle the assignor to take a renewal for himself.

If the rule were otherwise, ample room would be left for collusion which it might be difficult for the *cestui que trust* to expose. No such burden should be placed on the *cestui que*. It was said by Lord Chancellor KING, in *Keech v. Sandford,* Cas. T. King, 61, 15 Eng Rul. Cas., 455:

"If a trustee, on the refusal to renew, might have a lease to himself, few trust estates would be renewed to *cestui que* use; though I do not say there is a fraud in this case, yet he should rather have let it run out than to have had the lease to himself. This may seem hard that the trustee is the only person of all mankind who might not have the lease, but it is very proper that rule should be strictly pursued and not in the least relaxed; for it is very obvious what would be the consequence of letting trustees have the lease, on refusal to renew to *cestui que* use."

Chancellor Kent, in the case of *Davoue v. Fanning,* 2 Johns. Ch. (N. Y.), 252, says of the decision in *Keech v. Sandford,* supra:

"If we go through all the cases, I doubt whether we shall find the rule and the policy of it laid down with more strictness, clearness, and good sense. This decision has never been questioned."

Both cases, *Keech v. Sandford* and *Davoue v. Fanning,* were cited with approval by this court in *Neal v. Cox,* Peck (7 Tenn.), 443.

The lower courts were in error, therefore, in holding that since the landlord, Mrs. Strong, could not be restrained or prevented from renewing the lease to Lawless Bros., by reason of that fact or by parity of reasoning the latter could hold under it for themselves and as against their vendee and assignee. This is a *non sequitur*.

The fact that both of the leases contained a provision that they should "not be assigned or transferred by the lessees or by operation of law without the written consent of the owner" cannot operate to affect the right of Fine to have Lawless Bros. decreed to hold the demised premises in trust. The trust relationship is forced on the firm from considerations of public policy—to prevent persons in like situations from taking a benefit for themselves to the detriment of others to whom they are pledged not to do so. *Mitchell* v. *Reed,* supra. The quoted provision was meant to safeguard the right of the landlord. That right is a thing wholly distinct from the disability or liability of Lawless Bros.

As already indicated, we are of opinion and hold, with both of the lower courts, that Fine may not through the medium of the trust relationship thrust by law on Lawless Bros., or of any assignment by that firm of its rights in the renewal, compelled by equity, force himself as tenant for the new term on Mrs. Strong. Her volition and her discretion as to the selection of a tenant, in view of the above stipulation in her contract, are not to be denied or overridden,

Fine v. Lawless.

further than is involved in the disqualification of Lawless Bros. to enjoy the fruits of their grossly inequitable conduct.

It appears that prior to the filing of the bill of complaint Mrs. Strong had brought a suit before a justice of the peace against Fine to dispossess him. That suit was enjoined. It is contended by Fine that the injunction should be perpetuated, the position advanced being that she was without *status* to maintain an action of unlawful detainer after she executed the lease in reversion, covering the new term, to Lawless Bros. A lease in reversion is one which becomes effective only at the expiration of the term of the prior lease. The authorities in other jurisdictions are not in accord on the point whether, notwithstanding the execution of a second lease, the landlord remains clothed with such a right to the possession of the premises as that she may maintain a proceeding against the first tenant who refuses to surrender. The conflicting authorities are collected in notes 120 Am. St. Rep., 36, and L. R. A., 1915C, 199. The rule independent of any statute making special provision to the contrary appears by the weight of authority to be that, generally, the proceeding to dispossess may be maintained by the original landlord, on the theory that the lessee under a lease in reversion has no interest to that end until he gets possession; the duty remaining the landlord's to place his second lessee in possession. For the purpose of discharging the duty he may maintain a proceeding to dispossess the original tenant.

139 Tenn.—12

This court has not ruled the point, but the above view was indicated to be the true one in *McNairy* v. *Hicks,* 3 Baxt. (62 Tenn.), 378, if the first tenant is holding under a claim of right. The intimation in *Marley* v. *Rodgers,* 5 Yerg. (13 Tenn.), 217, is in favor of the landlord's right of action. We agree with the lower courts in holding that Mrs. Strong had the right to maintain the action of unlawful detainer under Thompson-Shannon Code, section 5093.

The legal attitude of Lawless Bros. in this case— disqualification to take as against or to dispossess Fine—is itself a potent argument in favor of this right being yet in the landlord.

We do not find it necessary to discuss other assignments of error. The material rulings of the court of civil appeals, except as above modified, are affirmed. A decree will pass accordingly; but should Mrs. Strong deem it proper, in view of Fine's claim to consideration at her hands, to yet insist upon her legal remedy to dispossess, her right to have a writ to that end will be stayed for ninety days following entry of final decree herein. The injunction against Lawless Bros. will be made perpetual, and they will pay all costs of the cause.