DAWKINS, J.
In- 1914' Leopold Jansen was the proprietor of a jewelry store being conducted in premises leased by him, by the year, on Burbon' street in the city of New Orleans, and which he had occupied for several years. Nicholas Bellamore was a dealer in optical goods, and had, up to that time, for some years, been occupying a certain building on Canal street, but which was leased by other persons, beginning in October of that year, and he was compelled to find another location.' After some investigation, he discovered that a certain four-story building, belonging to one George F. Lapeyre, could be had on October 1, 1914, for a yearly rental of $10,000. This, however, was more than he felt able to pay for his business alone, and he approached Jansen with the suggestion that they take the building together, each to occupy one-half of the ground or lower floor, and the upper stories to t)e subleased, and the returns thereof divided equally between them, thereby reducing the net rental to each, and that they share equally all necessary expense. Jansen, at first, demurred to the proposition, but, after enlisting the assistance of a real estate dealer by the name of Meyer Eisman, who, it seems had apprised Bellamore of the availability of the Lapeyre property, Jansen was finally ■induced to enter into the arrangement, after he had been shown that the more desirable location on Canal street could, be had in that way at a lesser rental than he was paying on Burbon street.
There is some dispute in the testimony as to what took place just before the consummation of the lease, but we think it established by a fair preponderance of the evidence that Bellamore first proposed to take the lease in his own name and to carry out the arrangement with Jansen by a separate contract. However, Lapeyre was unwilling to lease to Bellamore, because of the nature of *903 his stock as security for the rent, but, after requiring of Jansen a financial statement, showing a stock of some $80,000, Lapeyre finally agreed to accept him (Jansen) as a tenant, and the lease was made accordingly.
Bellamore contends that he never saw Lapeyre while these negotiations were going on, and hence could not have been refused as a tenant by the latter, and Lapeyre.corroborates Bellamore in this statement; but no explanation whatever is, offered as to why Bellamore, having found the building for rent and having initiated negotiations with Jansen for the joint occupancy thereof, did not take it in his own name, or in the name of both, but at least permitted Jansen to do so. On the other hand, Jansen says, and he is supported by the positive testimony of Eisman, a disinterested witness, that the reason for this was that Lapeyre declined Bellamore as a tenant because of the insufficiency of his stock, and eventually agreed to accept Jansen, after exacting a financial statement, showing a stock of the value mention, ed. (This statement as to the required financial statement is not denied by any of the parties, including Lapeyre.) Eisman says that he was present in Lapeyre’s office with Bellamore when the refusal was made, and the fact that the amount of the lease was $50,000, or $10,000 per year for five years, lends considerable force to that statement. Taken all in all, that view appears more consistent under all the circumstances, since Bellamore was the moving spirit in the enterprise, and Jansen was, at first, only passively interested.
After the lease from Lapeyre had been obtained in the name of Jansen, he and Bella.more entered into a contract of sublease, for the same length of time, at a price of $416.66 per month, represented by 60 notes, for one-half of the first floor to be used by the latter for his optical business, and in which appeared the following stipulations, in addition to those usual to the ordinary lease, to wit:
“It is understood between the lessor and lessee that the upper floors of the building are to be subleased, in which event such rent as is derived therefrom will go to the-joint account of the lessee and lessor. Only legitimate first-class mercantile or commercial business shall be permitted to sublease these floors. * * *
“This is a sublease, and it is distinctly understood between the parties hereto that the cost of all repairs, of whatsoever kind or nature, that the premises or appurtenances may require, either at the inception of, or at any time during the time of, this lease, including repairs to roof, floors, walls, elevator, plumbing, and sewerage fixtures and connections, etc., shall be paid jointly by lessor and lessee. * * *
“One-half of water supply to be at lessee’s cost, and he shall comply, and at all times, in the proportion of one-half, with all city laws and ordinances, and all the regulations and requirements of health and of the sewerage and water authorities, and also of Louisiana Eire Prevention Bureau, or other similar associations. * * *
“Electrical service, both lights and fans, shall be divided in the proportion of one-half to each of the tenants of the lower floor. A separate meter to be maintained by sublessee for the operation of motors for his optical manufacturing business.”
Some time later Jansen subleased the three upper floors to one Fred S. Kaufman for a period of 5 years, beginning October 1, 19-14, or during the life of his own lease, for a monthly rental of $250, and thereupon Jansen and Bellamore signed the following additional agreement with reference thereto, to wit:
“Agreement between Leopold Jansen and Nicholas Bellamore, witnesseth:
“A certain lease dated May 4, 1914, between Leopold Jansen and Nicholas Bellamore, especially states as follows:
“ ‘It is understood between lessor and lessee that the upper floors of the building are to be subleased, in which event such rent as is derived therefrom to go to the joint account of the lessee, and lessor.’
“There having been signed on the 9th of June, 1914, a lease between Leopold Jansen and Fred S. Kaufman, for the lease of the second, third, *905 and fourth floors of the building 707-709 Canal street, at a monthly rental of $250', and in view of the fact of the lease being in the name of Leopold Jansen, the notes given by the sub-lessee, Ered S. Kaufman, each for the sum or $250, have been made payable to Leopold Jansen. The first note is due on the 1st day of November, 1914, and the others on the 1st of each and every succeeding month thereafter, except the last note, which is made payable on the last day of the lease fixed. These notes are dated June 9, 1914, and are numbered from 1 to 60, inclusive.
“Now, then, in order to carry out the agreement as specified in the lease dated May 4, 1914, between Leopold Jansen and Nicholas Bellamore, it is hereby specifically agreed and understood that the 60 rent notes hereinbefore described will be deposited for collection in the Whitney Central National Bank,.in a special account to be opened as the ‘Jansen-Bellamore Collection Account,’ and the credits accruing thereto from the collection of these notes shall be subject only to a check signed jointly by both parties to this agreement, their heirs or assigns.
“It is primarily the purpose of this agreement to provide for the collection of these rent notes; and their payment by the parties to this agreement to Mr. George E. Lapeyre, owner of the building 707-709 Canal street, from whom the original lease has been secured.”
The parties all went into possession of the building pursuant to their respective leases and agreements. Jansen and Bellamore each occupied one-half of the ground floor, shared equally the rents from the three upper floors, and paid each one-half of the expenses as agreed upon. This condition and relation continued in an apparently amicable and satisfactory manner for the entire period of 5 years.
Some time during the summer of 1918, Bellamore opened negotiations with Lapeyre for the renewal of the lease upon the entire building, and it is at this point that the crucial question of fact arises and which has an important bearing upon the controversy.
Bellamore swears that, before going to Lapeyre, he asked Jansen, during the summer of 1918, what he intended to do about the lease which expired on 'September 30, 1919, som'e 15 months thereafter, and that Jansen merely shrugged his shoulders and walked away without giving any reply; that he later again mentioned the matter, and that Jansen said he had telephoned to Lapeyre’s office, and had been informed that the latter was not in town; that he (Bellamore) then went out upon the streets, and, seeing Lapeyre subsequently, perhaps during the same day, went to Lapeyre’s office; that he broached the subject of the lease, and was informed by Lapeyre that he would not renew with Jansen; and that he thereafter agreed upon a new lease for 10 years, to begin when the old one expired, at a price of $10,500 per annum, for the first 5 years, and $12,000 per year thereafter. He further swears that, after obtaining this new lease, he informed Jansen of the fact, and that the latter again manifested no interest therein. Lapeyre confirms Bellamore in the statement that he would not renew the lease to Jansen.
Jansen denies most emphatically that Bellamore ever said anything.to him about'the renewal of the lease. He says that his first information that Bellamore had taken the lease was received through a Mr. Stern, an auctioneer on Royal street, and that he immediately telephoned Mr. Lazarus, his counsel in this case, and that they together went to see Mr. Lapeyre to make inquiry, and were by him for the first time informed positively that the^ building had been leased to Bella-more; that Lapeyre refused to let him see the lease, or to give him any detailed information about it; that he then put the matter in the hands of his lawyer, who addressed to Bellamore a letter (to which we shall refer later), informing him of the fact that the leasing of the building had just been discovered, and, notwithstanding he and Bellamore continued to occupy opposite sides of the same room or store, meeting and seeing each other at all hours of the day, the latte? never at any *907 time made any denial of the fact that he had leased the building without his (Jansen’s) knowledge, or made any reference to the conversations to which he testified in this case.
[1] To begin with, Jansen having shown the existence of the relation between himself and Bellamore, as disclosed by the evidence above outlined, we think that the'burden was then shifted to the shoulders of Bellamore to establish by convincing evidence that he acted only after a full disclosure to his associate in the matter. This he does not pretend to have done, but according to his own testimony Jansen had given a somewhat weak manifestation of his purpose or desire to renew, by saying that he had telephoned to Lapeyre’s office and the latter was not in town, thus indicating, at least, that he had not definitely decided to give up the location. Thereafter, according to his own story, Bellamore took the matter up with Lapeyre, and, finding that he would not release to Jansen, took the new lease in his own name. It is true that he says that he afterwards informed Jansen of that fact, but he does not contend that Jansen ratified his action, but merely evidenced the same lack of interest which had attended the two former conversations.
[2] It is shown by the record that the jewelry business was not profitable during the period while this country was engaged in the World War, and that Jansen paid no income tax, though he carried a stock of some $80,000, and was entitled to an exemption of not more than $2,500; while Bella-more’s business grew, and he says he needed the whole store for himself. Counsel for defendants contend that this condition of things tends to corroborate Bellamore, and to explain why Jansen manifested no interest in the" renewal of the lease. However, plaintiff’s experience seems to have been the common lot of those engaged In the same business; he had paid his portion of the rent promptly, had a reasonably large stock, and had been in the jewelry business in this city for more than 30 years. It hardly seems probable that he had reached the con-. elusion to go out of business, and if he had known that the building could be had under an arrangement similar to that then existing by which his rent would actually have been less, though only a few dollars, for another period of 5 years, with 5 years additional, at an increase of $2,000 per year, we hardly think, taking all of the circumstances of the case into consideration, that he would have refused it. He undoubtedly had the right to a fair opportunity to consider what action he would take, after a full and fair disclosure of the true circumstances.
The course of conduct attributed to Jansen does not comport with ordinary, everyday human experience, and the fact that Bella-more did not record the renewal lease until April 9, 1919, when it had been executed on August 5, 1918, affords a circumstance tending to show, at least, that he did not wish to have its terms disclosed earlier. In the meantime, he had succeeded in inducing the common subtenant (Kaufman) to renew for 5 years the lease on the three upper floors, at an enhanced price of 20 per cent., or $50 per month, on the representation that he (Bellamore) would have to pay $12,000 per year, when, as a matter of fact, ah increase of only $500 per annum for that period had been exacted by Lapeyre. Then, while asserting that he desired to use the entire lower floor for himself, it so happened that his renewal from Lapeyre contained the following significant provision, similar to one appearing in the original to Jansen, viz.:
“At least one-half of the ground floor of the leased premises shall be used for the manufacture and sale of optical goods, photographic supplies, stationery, and articles of a kindred nature. The balance of the ground floor and the upper floors may be subleased by lessee, but only *909 for legitimate first-class mercantile or commercial businesses.”
Did this mean that he intended to demand his “pound of flesh” of Jansen, as he had done with Kaufman?
As soon as Jansen heard that the lease had been renewed, he took steps to assert such rights as he had, and promptly charged Bellamore, in a letter written by his counsel, with having clandestinely obtained the new lease, and called upon him to know if his (Jansen’s) rights would be recognized. This letter Bellamore never answered, and, notwithstanding the circumstances under which they did business, the charge was never challenged or denied, until the answer was filed in this suit.
[3] We conclude that the new lease was taken without Jansen’s knowledge; but, even if all that Bellamore gays was true, it would not, in our opinion, affect the legal rights of the parties.
Plaintiff’s petition set f.orth substantially the facts above mentioned, and alleged that in view of the relations existing between himself and Bellamore he was entitled to have the new lease declared to be for his joint benefit. Lapeyre was made a party defendant, for the reason that he had, in a letter, notified Jansen to turn over the portion of the store occupied by him to Bellamore, and a temporary restraining order was issued, enjoining these two defendants from dispossessing plaintiff until hearing. On the hearing, the lower court recalled the restraining order, and plaintiff appealed suspensively therefrom. This forms the basis of the record No. 23812. The case was later tried on its merits, resulting in a judgment rejecting plaintiff’s demands, and from this decree plaintiff likewise appealed.
Opinion.
Plaintiff contends that the relationship which existed between Jansen and Bella-more with respect to the leasing of this building was such as to preclude either party, during its existence, from acquiring any interest therein or thereon adverse to the other, and that the renewal which Bellamore took from Lapeyre must be held to inure to their joint benefit. Defendant takes the position that, while there was a relationship of joint tenancy, it was limited to a period of 5 years, and that there was no legal impediment to his acquiring a lease on the building, to begin when that relationship by the terms of their agreement should end, and, further, that since the owner would not, in any event, have been willing to renew the lease to Jansen, he has been deprived of no right or privilege which he could have exercised if Bellamore had not acquired it for himself.
[4] Jansen and Bellamore were not partners in the sense that they were jointly engaged in the same business; but, pursuant to a common desire to provide themselves with quarters in which to conduct their respective commercial enterprises, they did enter into an arrangement, mutually satisfactory and profitable, by which they were to share and did share equally, for a period of 5 years the benefits and advantages, as well as the expenses and outlays arising from the lease on this particular building. To this extent, and for all the purposes of the lease, there arose and continued to exist until its termination, a relationship carrying with it all of the rights and obligations of a particular or limited partnership. There was nothing in their agreement or in law which compelled them to continue their relations at the end of the 5 years; but all of the benefits and advantages, actual or potential, which it gave, belonged to them in indivisión, and nothing that the one might do could deprive the cither of his share. This rule of fair dealing was as effectual!/ written into their agreement by *911 the law as if it had been specifically stipulated.
Did the hope or prospect of renewal constitute a property right, such as the law will take cognizance of and protect, even though there was no provision or promise on the part of the lessor to that effect? The jurisprudence has so uniformly answered this question in the affirmative, that it would seem useless to cite authority. In the note to McCourt v. Singers-Bigger, 145 Fed. 103, 76 C. C. A. 73, in 7 Ann. Cas. 287, the annotator says:
“The cases are very numerous in which courts of chancery have recognized the equitable expectancy of renewal attached to a leasehold estate so far as to decree that new leases, granted upon the supposition of a right of renewal, should inure to the benefit of those interested in the old lease, and that persons standing in a fiduciary or quasi fiduciary relation to the old lessees should, when they have secured renewal to themselves, be regarded as constructive trustees for the first lessees. There seems to b'fe no real dissent from this doctrine, which has been steadily maintained by both English and American courts. * * * ”
See also, Pomeroy’s Equity Jurisprudence (4th Ed.) vol. 1, § 1050; Fine v. Lawless, 139 Tenn. 160, 201 S. W. 160, L. R. A. 1918C, 1045.
The rule is not confined to any particular class of contracts or undertakings, but applies with equal force in every case where there exists a relationship of trust between the parties, requiring the exercise of mutual good faith and fair dealing, though it finds most frequent application among partners, attorneys and clients, tutors and wards, principals and agents, etc. The case most similar in its facts to the present one is that of Hackett et al. v. Patterson (Com. Pl.) 16 N. Y. Supp. 170, cited by the plaintiff. In that ease the parties had leased jointly a safety deposit vault in a bank, and one of the lessees subsequently, and during the existence of the lease, died, and the other, after his colessee’s death, but while the lease was in force, obtained a new lease in his own name, to take effect when the old one ended. The executor of the decedent sued to have the new lease decreed to inure to the joint benefit of the decedent, and sought to enjoin the survivor from interfering with the executor in the exercise jointly of the- rights of lessee. The court said:
“The new lease constituted plaintiffs and defendant Patterson joint lessees, and whether their relation thereunder was that of joint tenants or tenants in common is equally immaterial in disposing of the question presented for adjudication, since either relation involves the application of the same principles of equity jurisprudence.
“ ‘Equality is equity,’ and, steadily adhering to the application of this familiar maxim courts of equity have ever regarded the rights of joint tenants and tenants in common respecting their common estate to be reciprocal, neither being permitted during the continuance of the cotenancy furtively to acquire and hold any advantage which would not also inure to the other’s benefit, provided the latter manifests a willingness to assume his just proportion of any burdens attending its acquisition and maintenance.”
See, also, Cushing v. Danforth, 76 Me. 117; Davis v. Hamlin, 108 Ill. 139, 48 Am. Rep. 541.
Did the unwillingness of Lapeyre to renew the lease to Jansen affect-the operation of the principle as between Jansen and Bellamore?
Lapeyre gave to Bellamore a lease which, instead of denying, specifically authorized the subleasing of one-half of the ground floor, as well as the upper stories of the building, just as the original had done to Jansen, and it nowhere excepted or specified any one to whom he might or might not grant those privileges. If, at any time, Bellamore should see fit to abandon his present position, and to recognize Jansen as jointly interested, Lapeyre could not complain. He is therefore without interest to champion the cause of either. That which Bellamore could do voluntarily, the law compels him to do involuntarily. It does Aot compel him to continue any particular relation with Jansen, but it does say that the new lease belongs to the *913 parties in the same proportions as the old, the rights of the one being coextensive with those of the other, and neither has any right superior to that of the other.
In the case of Keech v. Sanford, 25 Eng. Reprint, 223, it was said:
“If a trustee, on the refusal to renew, might have a lease to himself, few trust estates would be renewed to cestui que use; though I do not say there is fraud in this case, yet he should rather have let it run out than to have had the lease to himself. This may seem hard that the trustee is the only person of all mankind who might not have the lease, but it is very proper that rule should be strictly pursued, and not in the least relaxed; for it is very obvious what would be the consequence of letting trustees have the lease on refusal to renew to Cestui que use.”
Chancellor Kent, in commenting upon this case, in Davoue v. Fanning, 2 Johns. Ch. (N. Y.) 253, said:
“If we go through all the cases, I doubt whether we shall find the rule and the policy of it laid down with more clearness, strictness, and good sense. This decision has never been questioned.”
See, also, Fine v. Lawless, 139 Tenn. 160, 201 S. W. 160, L. R. A. 1918C, 1045; Grumley v. Webb, 44 Mo. 444, 100 Am. Dec. 304; Rowley on the Modern Law of Partnership, vol. 1, p. 466; Tiffany on Landlord, and Tenant, vol. 2, p. 1555; R. C. L. vol. 20, pp. 827, 881; Knapp v. Reed, 88 Neb. 754, 130 N. W. 430, 32 L. R. A. (N. S.) 869; Lurie v. Pinanski, 215 Mass. 229, 102 N. E. 629; McClendon v. Bradford, 42 La. Ann. 160, 7 South. 78, 8 South. 256; Smith’s Ex’r v. Dwight, 10 La. Ann. 691; Lowry v. Cobb, 9 La. Ann. 592; Brigham et al. v. Newton et al., 49 La. Ann. 1539, 22 South. 777.
For the reason assigned, the judgment appealed from is avoided, annulled, and reversed, and it is now ordered and decreed that the plaintiff, Leopold Jansen, do have and recover judgment against the defendant Nicholas Bellamore, decreeing the lease on the building Nos. 707 and 709 Canal street, on the 5th day of August, 1918, in the name of the said Bellamore, to inure to the joint and equal benefit of the said plaintiff and defendant; and 4t is further ordered and decreed that the defendant George F. Lapeyre be and he is hereby enjoined and restrained from dispossessing or in any manner interfering • with the said Jansen in the exercise of the rights accruing therefrom. Defendants to pay all costs.