356 So.2d 1115 (1978)
W. A. McMICHAEL CONSTRUCTION COMPANY, Plaintiff-Appellee,
v.
D & W PROPERTIES, INC., et al., Defendants-Appellants.
No. 13492.
Court of Appeal of Louisiana, Second Circuit.
February 20, 1978.
Rehearing Denied April 4, 1978.
Writ Refused June 2, 1978.
*1116 Wiener, Weiss, Madison & Howell by John M. Madison, Jr., Shreveport, for defendants-appellants.
Wilkinson, Carmody & Peatross by Charles B. Peatross and Samuel W. Caverlee, Shreveport, for plaintiff-appellee.
Before PRICE, HALL and MARVIN, JJ.
En Banc. Rehearing Denied April 4, 1978.
HALL, Judge.
Plaintiff, W. A. McMichael Construction Company, a partnership composed of Willie
*1117 A. McMichael and Fred J. McMichael, filed suit as a former partner in a land development partnership seeking to set aside an agreement by which it withdrew from the partnership, transferred its interest in the partnership to the managing partner, D & W Properties, Inc., and released all claims against the partnership, its partners and its assets. The petition alleged fraud, withholding of material information, and breach of fiduciary duty by the managing partner. Plaintiff prayed that it be restored to the equity position it held on the date of execution of the agreement, that it be recognized as the owner of a 41 2/3 percent interest in the partnership assets, and, alternatively, that it be awarded damages. After trial the district court found that D & W breached its fiduciary obligation owed to plaintiff, declared the agreement void, and ordered plaintiff reinstated to its former position. Defendants appealed. For reasons expressed in the trial court's reasons for judgment and in this opinion, the judgment of the district court is affirmed, except that plaintiff's interest is recognized as 38.9 percent rather than 41 2/3 percent.
After careful review of the record, this court is in full agreement with and adopts the findings of fact and conclusions expressed by the district court, as follows:
"In August, 1973, a partnership was formed between plaintiff, Evans & Evans, an architectural partnership, and D & W Properties, Inc. The partnership so formed was called Southside Center Associates, with each of the partners owning an undivided one-third interest. The partnership owned an option from Alice Bell McCrary, et al., to lease a 34.35 acre tract of land located in the southwest portion of Shreveport. D & W Properties, Inc., with F. H. Delaney as President, was designated as managing partner of Southside Center Associates under the terms of the partnership agreement.
"The architectural firm of Evans & Evans became dissatisfied with the situation and on February 22, 1974, wrote to defendant Delaney and expressed its desire to withdraw from the partnership. On March 5, 1974, effective February 28, 1974, Evans & Evans withdrew as a partner in Southside and conveyed its entire interest to the partnership. Following this withdrawal, two additional corporations were added as partners to Southside, namely John J. Guth Associates, Inc. and Aillet, Fenner, Jolly & McClelland, Inc., each of whom acquired an undivided one-twelfth interest, leaving a five-twelfths interest owned by D & W Properties, Inc. and the remaining fivetwelfths interest owned by plaintiff.
"It was not long before the McMichaels became dissatisfied with progress of their investment. The record shows that the property on which the partnership held an option to lease was nearby the property on which the South Park Mall was constructed and this latter development had an adverse effect on development of the partnership option acreage. In July, 1974, a meeting of the Southside Center Associates partners was held and there was considerable pessimism expressed by Mr. Delaney regarding the efforts of D & W or himself in obtaining development of the partnership property. It was known at the time of this meeting and reported to the partners by Mr. Delaney that he had been negotiating with a real estate agent for a local bank to lease a portion of the property.
"Subsequent to the July meeting the McMichael partners made inquiries of Mr. Delaney concerning progress in developing and obtaining leases on the option acreage, but they were advised that there had been no progress. Plaintiff failed to make payment of monthly statements it received for its part of partnership expenses, including monthly option payments to the McCrary property owners from after June, 1974. Plaintiff, through W. A. McMichael, discussed this with Mr. Delaney and advised that plaintiff would make no more payments to the partnership, but would take a reduced percentage of ownership in the partnership. In September, Mr. Delaney discussed this problem with one of his attorneys, Mr. Jacques L. Wiener, Jr., and was advised that there was a serious problem in resolving the dispute between the partners *1118 if litigation had to be pursued since the option was due to expire in the early part of 1975. On October 4, 1974, a letter was sent by Mr. Delaney on behalf of Southside Center Associates (Exhibit J-D) advising plaintiff that it was in default under the terms of the partnership agreement and was deemed to have voluntarily withdrawn from the partnership, but that Mr. Delaney and his `associates' would agree to cancel any past or future indebtedness of plaintiff and refund the sum of $1,958.00 if plaintiff would withdraw from the partnership. This letter was received by plaintiff on October 5 or 6, 1974.
"On October 4, 1974, D & W Properties, Inc., through its President, F. H. Delaney, executed a document entitled `Agreement to Lease' a portion of the property covered by the partnership's option. The Agreement to Lease was with The First National Bank of Shreveport and was signed by its President, J. Hugh Watson, on October 9, 1974. This document is identified as Exhibit J-G.
"By letter dated and mailed October 16, 1974, to Mr. Delaney (Exhibit J-E), plaintiff declined the earlier offer contained in Mr. Delaney's letter of October 4 to plaintiff concerning withdrawal from the partnership and requested that no action be taken that would affect plaintiff's rights as a partner.
"Prior to receipt of the letter from plaintiff, Mr. Delaney, on October 16, 1974, arranged for and met with the McMichael brothers in their office and at that meeting Mr. Delaney, on behalf of D & W Properties, Inc., offered plaintiff the sum of $23,000.00 in cash for its interest in the partnership. The next day, on October 17, 1974, plaintiff accepted this second offer of cash and entered into a formal transfer of all of its interest in the partnership to D & W Properties, Inc. (Exhibit J-F).
"The evidence is clear, convincing and uncontradicted that Mr. Delaney did not reveal to the McMichael brothers the existence of the Agreement to Lease which he had executed with The First National Bank of Shreveport. Further, the evidence established that he did not inform them of letters between himself and Mr. Jim Dowling, a member of the real estate firm of J. Wesley Dowling & Associates, Inc., who was obtaining a site for The First National Bank. These letters, filed in evidence as Exhibits P-1, P-2 and P-3, contained specific proposals in connection with a ground lease, the area to be contained within the lease, the term, the rental, etc. Reference to the Agreement to Lease subsequently signed by the bank and by Mr. Delaney shows that most of the proposals were accepted and incorporated therein.
"Subsequent to the withdrawal of the plaintiff as a partner, Southside Center Associates conveyed all of partnership's right, title and interest in the McCrary property to Park South Properties, a partnership which was formed for the purpose of obtaining that option. This new partnership consisted of its general partner, Delaney Mansfield Properties, a partnership composed of F. H. Delaney, Howard R. Crumley, Norman V. Kinsey and Edwin F. Whited, and its partners in commendam, John J. Guth, Jr., Robert R. Aillet, Robert D. Fenner, Edward M. Jolly and H. H. McClelland. The percentage ownership was established as Delaney Mansfield Properties owning 90 percent, Mr. Guth owning five percent, and 1.25 percent each owned by Messrs. Aillet, Fenner, Jolly and McClelland.
"On December 31,1974, Park South Properties exercised its option to lease the McCrary property. On April 7, 1975, Park South entered into a ground sub-lease (Exhibit J-K) with The First National Bank covering 1.15 acres of the property on which Park South had obtained the ground lease by virtue of exercising the option. This sub-lease appears to contain most of the essential provisions as set forth in the Agreement to Lease previously identified as Exhibit J-G.
"The McMichael brothers, Willie A. McMichael and Fred J. McMichael, had no knowledge of the Agreement to Lease or the sub-lease. In October, 1975, the McMichaels became aware of the Agreement to Lease (Exhibit J-G) which had been executed *1119 in October, 1974. This suit was then filed seeking, among other remedies, to set aside the October 17, 1974, agreement by which it had withdrawn from the partnership and seeking to restore it to its position prior to execution of the agreement of October 17, 1974, and recognizing it as owner of 41 2/3 percent interest in the lease between the McCrary owners and Park South Properties and, in turn, the lease between Park South and The First National Bank. Alternative remedies sought in the event that plaintiff could not be restored to its former position consisted of a demand for money damages.
"Before proceeding further we think it important to also comment that Mr. W. A. McMichael testified that he was of the opinion that the partnership agreement gave his partnership the right to cease payments of regular partnership expense items and thereby reduce its equity position in the partnership. Whether he was justified in this view is not so important as the fact that he adhered to this view and discussed it with Mr. Delaney prior to Mr. Delaney's meeting with Mr. Jacques Wiener, Jr. in September, 1974.
* * * * * *
"We believe that the law of this state places upon each partner a fiduciary relationship with his other partners. This fiduciary relationship or duty would certainly apply to the managing partner who has been given management responsibilities by the remaining partners. We do not believe that such fiduciary relationship was observed by Mr. Delaney when he acquired the interest of plaintiff without making full disclosure of the Agreement to Lease which he signed on October 4 and which was signed by The First National Bank on October 9.
"While Mr. Delaney characterized this document as a mere `negotiating tool' and as not being an overly significant document, we can not accept such a view as reasonable or excusable in view of the facts. This was the only significant development in connection with the property covered by the option. It is further noted that Mr.
Delaney testified in his discovery deposition in answer to a question as to whether it had ever entered his mind to tell the McMichaels about the Agreement to Lease, `I was out there to buy them out, not to give them a progress report.'
* * * * * *
"We are satisfied that a fiduciary relationship existed between the partners in this case and that this relationship was breached by one of the partners, acting through Mr. Delaney. Accordingly, we hold that the Agreement of October 17, 1974, Exhibit J-F, is now set aside and plaintiff is to be restored to its position immediately prior to the execution of that Agreement. An appropriate accounting as between plaintiff and defendants is called for. We believe that based on the evidence in this case plaintiff can be restored to its former position and, therefore, order that this be done in lieu of our assessing monetary damages. We will leave it to the very capable counsel for the parties herein to prepare an appropriate judgment. A reasonable time will be given within which they may attempt to work out the details which are to be incorporated in such judgment so as to restore plaintiff to its previous position as a partner in the ownership of the option of McCrary property. Such judgment will, of course, cast defendants for all costs of these proceedings."
The judgment signed in accordance with the district court's opinion recognized plaintiff as the owner of 41 2/3 percent of the interest in and to the lease agreement by and between Alice Bell McCrary, et al and Park South Properties, and referred to a written agreement entered into between the parties pursuant to the judgment. A copy of the agreement between the parties is not in the record.
Defendants' contentions, expertly and vigorously urged on appeal, may be summarized as follows:
(1) No fiduciary duty was owed to the plaintiff by the managing partner, D & W, or its president, Delaney, after August 1974, when plaintiff announced its refusal *1120 to pay its share of the monthly lease option payments due by the partnership, thereby breaching plaintiff's obligations under the partnership agreement;
(2) The failure of D & W and its president, Delaney, to disclose the existence of the Agreement to Lease did not amount to a breach of fiduciary duty because the agreement was not significant or material to the partnership venture or the negotiations being carried on between D & W and plaintiff, and, at the most, the failure to disclose an oversight or negligent act on the part of Delaney;
(3) The negotiated, written agreement of compromise and settlement should not have been set aside in the absence of a finding by the court of fraud or willful misrepresentation; and
(4) In any event, plaintiff is entitled only to a reduced interest in the partnership assets in view of its failure to pay its share of the monthly lease option payments, and a new trial should be granted in order to determine the amount of plaintiff's interest.

I.
Although the fiduciary relationship between partners is not expressly defined in the articles of the Louisiana Civil Code on partnership, LSA-C.C. Arts. 2801, et seq., and there are few Louisiana cases dealing with the subject, the fiduciary duty owed by partners to each other is uniformly recognized throughout the country. Louisiana courts have frequently drawn on authority from other states in dealing with the law of partnerships. See F. Hodge O'Neal, An Appraisal of the Louisiana Law of Partnership, 9 La.L.Rev. 307 and 450 (1948-1949).
In Corpus Juris Secondum, the general rule and the higher duty of a managing partner are stated as follows:
"The relation of partnership is fiduciary in character, and imposes on the members of the firm the obligation of the utmost good faith in their dealings with one another with respect to partnership affairs, of acting for the common benefit of all the partners in all transactions relating to the firm business, and of refraining from taking advantage of one another by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind.
. . . The obligation is especially stringent on a partner who is managing the business . . .
"Although, in some jurisdictions, statutes expressly provide that partners are trustees for each other with respect to partnership property and transactions within the meaning of statutes relating to trust, the relationship of trust has also been held to exist between partners without reference to statute. A managing partner particularly is held to be under a duty analogous to that of a trustee, and he must conduct the business in the interest of the partnership.
"It has been held that each partner has a right to know all that the others know regarding the partnership affairs, and is under the duty not only of not concealing any material matter regarding such affairs, but of fully divulging to his co-partners all matters within his knowledge material to the affairs or property of the partnership, at least on demand." 68 C.J.S. Partnership § 76 (pp 516-518) (fn. deleted) (emphasis supplied)
In analyzing the obligations at the time one partner purchases another partner's interest, this Encyclopedia states:
"The necessity for good faith as between the partners extends to cases of the transfer of one partner's interest to another or to a transfer of a part of his interest, and full disclosure of all material facts must be made even though strained relations may exist between the partners." 68 C.J.S. Partnership § 102 pp 542-543 (fn. deleted) (emphasis supplied)
American Jurisprudence 2d, Partnership, Sec. 123, pp. 47-48 and Sec. 125, p. 50, is to the same effect.
The fiduciary relationship is recognized in the Uniform Partnership Act. 6 U.L.A. (Partnership Act) § 21. See also, Annotation: Duty in Respect of Good Faith and
*1121 Disclosure of Information Upon Sale of Member's Interest in a Partnership Adventure to Other Members, 120 A.L.R. 724.
Legal writers in Louisiana have discussed the fiduciary relationship between partners. In 45 Tul.L.Rev. 367 (1971), the general fiduciary duty is explained:
"In all matters related to the partnership, partners are regarded as fiduciaries of one another and of the firm. The partnership relation, one of trust and confidence, necessarily imposes upon the parties the highest standards of good faith and due diligencethe duty to act for the common benefit in transactions relating to or affecting the firm, and the duty to refrain from obtaining any personal advantage by the slightest misrepresentation, subterfuge or concealment. This obligation continues with regard to the firm's assets even after dissolution of the partnership.
* * * * * *
"The scope of the partner's fiduciary obligation is not limited to the circumstances previously discussed. The modern tendency has been to expand the breadth of the fiduciary duty in all areas of substantive law, and certainly, partnership law will not escape the influence of this modern approach. Consequently, an attorney, in advising a client of the extent of his obligation as a partner, should be aware of the possible applicability of the fiduciary rules even to good faith transactions."
In 35 La.L.Rev. 887, 888 (1975), it is observed:
"French theory views partnership as a reciprocal contract of mandate which suggests a fiduciary relationship between the partners. Likewise at common-law, a partnership has been characterized as a legal relationship which implies knowledge of and competence in the personal character, skill and ability of the associates, with each partner entitled to rely on the personal cooperation, advice and aid of the other partners in all partnership endeavors."
In Jansen v. Bellamore, 147 La. 900, 86 So. 324 (1920), the court found that between two parties jointly involved in a lease: ". . . there arose and continued to exist until its termination, a relationship carrying with it all the rights and obligations of a particular or limited partnership.. . . all of the benefits and advantages, actual or potential, which it gave, belonged to them in indivision, and nothing that the one might do could deprive the other of his share. This rule of fair dealing was as effectually written into their agreement by the law as if it had been specifically stipulated.
* * * * * *
"The rule is not confined to any particular class of contracts or undertakings, but applies with equal force in every case where there exists a relationship of trust between the parties, requiring the exercise of mutual good faith and fair dealing, though it finds most frequent application among partners, attorneys and clients, tutors and wards, principals and agents, etc. . . "
The court held that once the existence of the relationship was shown, the burden shifted to the party who obtained a gain upon renewal of the lease ". . . to establish by convincing evidence that he acted only after a full disclosure to his associate in the matter."
One of the defenses was that the plaintiff had no interest in renewal of the lease. The court held:
". . . we hardly think, taking all of the circumstances of the case into consideration, that he would have refused it. He undoubtedly had the right to a fair opportunity to consider what action he would take, after a full and fair disclosure of the true circumstances." (Emphasis supplied)
In the case of Lowry v. Cobb, 9 La.Ann. 592 (1854) the court very early analyzed the basic relationship of a partner to a partner: ". . . [A] partner has not a right to prefer his own interest to that of the firm, nor deprive the partnership of a *1122 profitable bargain by taking to his own account. The doctrine is obviously deducible from the nature of the contract of partnership, on entering into which, the partner promises to his associates his efforts for the common benefit. This promise he would violate, by seeking his individual advantage to that of the partnership. Hence, the books abound in cases where a partner who, while his relations as such existed, has stipulated clandestinely for any private benefit to himself, has been compelled to divide such gains with his associates." 9 La.Ann. at 593.
In Grand Isle Campsites, Inc. v. Cheek, 262 La. 5, 262 So.2d 350 (1972), involving a joint venture which is likened to a partnership, the court held that there was a fiduciary relationship between the joint venturers and found a violation of the fiduciary duty.
In Noe v. Roussel, 310 So.2d 806 (La. 1975), a case concerning a transaction between a corporate liquidator and a foreign corporation in which the liquidator had a financial interest, the court discussed the fiduciary duty and burden of a corporate liquidator as follows:

"We hold, therefore, that an agent who acquires his principal's property, or one who otherwise acts in a fiduciary capacity, bears the burden of establishing that the transaction was an arm's length affair. This means that the agent or fiduciary must handle the matter as though it were his own affair. It also means the agent or fiduciary may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights of his principal against all other persons whomsoever, and is bound not to act in antagonism, opposition or conflict with the interest of the principal to even the slightest extent. The reason for the rule is obvious." 310 So.2d at 818. (emphasis supplied)
LSA-R.S. 9:3801 includes "partner" in the definition of "fiduciary" in the Uniform Fiduciaries Law.
The law applicable to the case at bar may be summarized as follows: The relationship of partners is fiduciary and imposes upon them the obligation of the utmost good faith and fairness in their dealings with one another with respect to partnership affairs. Each partner must refrain from taking any advantage of another partner by the slightest misrepresentation or concealment of material facts. The obligation is especially stringent on a partner who is managing the business, his duty being analogous to that of a trustee. The fiduciary duty of the partners is particularly applicable when one partner seeks to purchase the interest of another partner. Such a sale will be sustained only when it is made in good faith, for a fair consideration, and on a full and complete disclosure of all important information as to value. This duty of disclosure holds true despite the fact that the relations between the partners have become strained or in conflict. The fiduciary duty continues through the sale or purchase of a partner's interest or through termination and liquidation of the partnership.
Defendants do not seriously contend that there was not a fiduciary relationship between the partners, acknowledging that partners have a duty to deal fairly and honestly with each other. Defendants do seriously contend, however, that D & W's fiduciary duty to disclose was terminated by plaintiff's refusal to make further payments to the partnership account which was an active breach of the terms of the partnership agreement.
The answer to this argument is twofold. First, the partnership agreement did not obligate plaintiff to make further capital contributions to the partnership without its consent, as will be discussed more fully in a later section of this opinion. Second, the great weight of authority is that the fiduciary relationship continues to exist even though there is conflict and disagreement between the partners and even though cause is given by one of the partners for dissolution of the partnership. The fiduciary relationship has been consistently *1123 recognized in connection with buy and sell transactions which are often brought about by conflicts and disagreements between the partners. D & W, through its president, Delaney, had a fiduciary duty to disclose to plaintiff all material facts within its knowledge through the time of the execution of the agreement by which D & W purchased plaintiff's interest in the partnership.

II.
Defendants next contend that the agreement to lease signed by Delaney on October 4 and by the Bank on October 9, prior to consummation of the buy out on October 17, was not significant because it represented a mere intent to lease, was not a binding contract, and required considerable further negotiation before the lease could become a reality. Defendants characterize the agreement to lease as a mere step in negotiations or as a negotiating tool. Defendants contend the execution of the agreement to lease was not material because it was not objectively demonstrated that plaintiff would have stayed in the partnership if it had known about the agreement to lease.
The evidence is to the contrary and fully supports the trial court's finding that the execution of the agreement to lease was significant and material.
The agreement to lease obligated the partnership and the Bank to enter into a lease of part of the partnership property and covered the basic and essential terms such as duration of the lease, annual rental, size of the property, and the like. The agreement contained a clause providing that only the basic elements of the proposed lease were outlined and that all details of the lease would be prepared at a later time. This clause might have provided an escape for either of the parties had they chosen not to go through with the deal. Nevertheless, there was agreement on the basic essentials of the lease and no reason to contemplate, after signing of the agreement, that the lease would not be consummated. Although there were some hard negotiations on the other provisions of the lease and some problems, such as title problems, which had to be resolved, a lease was in fact consummated in due course in accordance with the basic terms of the agreement to lease. At the time the agreement to lease was signed, D & W, through its president, Delaney, had every reason to believe that the lease would be consummated. The agreement to lease was a major and significant step in the progress of the venture and in accomplishment of the basic purpose and object of the partnership.
The lease of a corner lot containing slightly more than one acre of the 34 plus acres included in the option to lease provided for an annual rental of $20,500, as compared to the total annual rental of $24,000 to be paid by the partnership to the McCrarys on the lease of the whole property, leaving the balance of the property subject to further development. The McMichaels testified they would not have sold their interest in the partnership if they had known about the agreement to lease. Objectively, it would seem that a lease of one acre out of a 34-acre tract at a rental which would cover the greater part of the lease rental on the whole tract reasonably assured the ultimate success of the venture, although it would still be operating at a deficit until further development. Objectively, it would seem that a reasonable businessman who had elected to go into this kind of venture would not have, with knowledge of the agreement to lease, sold his interest for less than the amount he had invested in the venture. In any event, plaintiff was entitled to make that election with full knowledge that the agreement to lease had been signed. The continued participation by the D & W group and other partners weighs against the contention that the venture was still not an attractive business deal even with the agreement to lease in hand.
Even if Delaney's failure to disclose the existence of the agreement to lease was unintentional, or a mere oversight or negligence on his part, as urged by defendants, the failure to disclose is not any less a breach of the managing partner's fiduciary duty.

*1124 III.
Defendants contend the court should not have set aside the negotiated written agreement of compromise and settlement between D & W and plaintiff in the absence of a finding of fraud or willful misrepresentation. The instrument was entitled "Agreement of Settlement, Termination and Release" and recognized that "real and justiciable controversies" had developed between the parties. In addition to providing for the withdrawal of the plaintiff from the partnership and the transfer of plaintiff's interest to D & W, it provided that the compromise was intended to be "total, permanent and unconditional as to all matters of every nature and anywise directly or indirectly related to the activities, assets, adventures in which said parties were formerly involved, directly or indirectly, and that none of the parties reserve any rights, claims or charges, past, present or future, disclosed or undisclosed."
Defendants rely on the following principles of law; public policy strongly favors compromise settlements to avoid litigation, Meinerz v. Treybig, 245 So.2d 557 (La.App. 3d Cir. 1971), writ refused 258 La. 580, 247 So.2d 395 (1971); a compromise settlement agreement has the same effect as a definitive judgment upon the parties to the agreement, LSA-C.C. Art. 3078; Matthew v. Melton Truck Lines, Inc., 310 So.2d 691 (La.App. 1st Cir. 1975); and a compromise agreement may not be set aside unless there has been fraud or misrepresentation of material fact by one of the parties; Thompson v. Stacy, 148 So.2d 834 (La.App. 4th Cir. 1963). Defendants contend that fraud as defined by LSA-C.C. Art. 1847 was not established because it was not proved that Delaney had the requisite intent to deceive.
Legally given consent of both parties is requisite to the validity of a contract, so that there is no consent and no valid contract where the consent has been produced by error or fraud. LSA-C.C. Arts. 1779, 1819, 1824. Compromises are a species of contract which cannot be attacked because of error of law, but which may be rescinded because of error of fact, or in the case of fraud. LSA-C.C. Arts. 3078, 3079. See also LSA-C.C. Arts. 1828-1831. In the case of error, where the information which would have destroyed the error has been withheld by the other party to the contract, it comes under the heading of fraud, and invalidates the contract. LSA-C.C. Art. 1832.
Numerous cases hold that an intention to deceive and resulting loss or damage are essential elements of fraud. Fraud must be proved by him who alleges it, but it may be proved by simple presumptions or by legal presumptions, as well as by other evidence. The maxim that fraud is not to be presumed means no more than it is not to be imputed without legal evidence. LSA-C.C. Art. 1848.
Louisiana courts have had difficulty articulating, within the framework of civil law concepts, the theory upon which redress is granted for breach of fiduciary duty, particularly where the redress is the setting aside of a sale. Mansfield Hardwood Lumber Company v. Johnson, 263 F.2d 748, on rehearing 268 F.2d 317 (5th Cir. 1959), certiorari denied, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959), rehearing denied 361 U.S. 926, 80 S.Ct. 290, 4 L.Ed.2d 241. However, whether based on fraud, presumptive or constructive fraud, error, or equitable principles, Louisiana courts have consistently set aside transactions or otherwise afforded effective relief where a fiduciary secured an unfair advantage by failure to disclose material information to the principal's detriment. See the cases cited in Section I of this opinion and the cases cited in Mansfield Hardwood Lumber Company v. Johnson, supra. Although the result in some of these cases was predicated on a specific finding of fraud or an intent to deceive, the same result was reached in a number of other cases without such a specific finding. Breach of fiduciary duty was the key ingredient in all of the cases.
On the basis of the finding by the trial court and this court that the managing partner through its president breached its fiduciary duty to plaintiff by failing to disclose *1125 material and pertinent information, plaintiff is entitled to have the settlement agreement which included a sale of its interest in the partnership set aside and is entitled to be restored to the position it held at the time the agreement was executed.

IV.
In the summer of 1974, the capital contributions previously made by the partners were depleted. In order to make the monthly lease option payments it was necessary that additional capital contributions be made by the partners. D & W and the minority partners paid their share of the monthly payments as they came due. Plaintiff refused to pay its share of the monthly payments, taking the position that under the partnership agreement it was not required to make additional capital contributions, and that as necessary additional contributions were made by the other partners plaintiff's interest in the partnership would be reduced. Plaintiff's refusal was made prior to the time negotiations with the Bank's broker intensified and there was no failure to disclose information at that time. D & W advanced plaintiff's portion of the monthly lease option payments for June, July, August, and September, billing plaintiff for its share, which plaintiff never paid.
Defendants contend that since plaintiff did not make its share of additional capital contributions and was claiming a reduced interest in the partnership at the time the October buy-out agreement was signed, plaintiff should not be restored to its full 41 2/3 percent interest in the partnership or its assets. Defendants contend that because plaintiff's "capital account" was in a deficit position at the time of the buy out, plaintiff's interest was reduced to zero. Defendants ask that the case be remanded to determine the exact interest of plaintiff prior to the buy out.
The partnership agreement provides in pertinent part:

"IV "CAPITAL

"A. The original capital of the partnership shall be contributed in cash by the parties hereto as follows:

D & W Properties, Inc. $25,000.00 (331/3%)
Evans & Evans $25,000.00 (331/3%)
W. A. McMichael Construction
Company $25,000.00 (331/3%)

"B. The parties hereto recognize that additional capital may and probably will become necessary or advisable, and they agree that, upon the affirmative vote of all of the partners, they will furnish such additional capital as may be called for by such partners, provided, however, that no call or calls for additional capital shall exceed TEN THOUSAND AND 00/100 ($10,000) DOLLARS per partner in the aggregate.
"C. Should any partner fail or refuse for any reason to contribute additional capital, if additional capital is necessary under the provisions of Sub-Paragraph B above, then it is agreed that the remaining partners, or any one of them, shall have the right to contribute the defaulting partner's portion of the additional capital, in the same proportion that they have contributed to the capital of this partnership, and having done so, each partner so contributing thereby increases his percentage in the partnership."
Paragraph IV B. recognizes that additional capital might be necessary but requires the furnishing of additional capital only upon the affirmative vote of all of the partners. Since plaintiff did not affirmatively vote to furnish additional capital it was not obligated or required to do so and was not in breach of its obligations by refusing to pay its share of additional expenses. Plaintiff refused to contribute additional capital and D & W contributed the defaulting plaintiff's portion of the necessary additional capital. Having done so, D & W thereby increased its percentage in the partnership and plaintiff's percentage was reduced, under the express provisions of Paragraph IV C. The increase and corresponding reduction should be calculated in proportion to the total capital contributed by the respective partners. The status of *1126 plaintiff's capital account, which takes into consideration partnership losses, and the provisions of the partnership agreement on withdrawal from the partnership, have no application to the circumstances governed by Paragraph IV of the partnership agreement.
The evidence discloses that D & W and plaintiff originally contributed $25,000 each. They each later contributed an additional $5,000. From June through September 1974, D & W contributed an additional $2,443.75 for its own account and advanced $2,152.08 for plaintiff's share of expenses during that period. Plaintiff contributed an additional $291.67. At the end of September 1974, the total capital contributed by each partner was $34,595.83 by D & W and $30,291.67 by plaintiff. In proportion to each other D & W has contributed 53.3 percent and plaintiff has contributed 46.7 percent of their combined contributions of $64,887.50. Applying these percentages to their original combined 83.3 percent interest gives D & W a 44.4 percent interest and plaintiff a 38.9 percent interest in the partnership. Under the provisions of Paragraph IV B. of the partnership agreement, this was the interest of the partners at the time the buy-out agreement was executed and is the interest to which the partners should be restored upon setting aside that agreement. The judgment will be amended accordingly.
The judgment of the district court is amended to provide that the interest of plaintiff, W. A. McMichael Construction Company, is 38.9 percent and, as amended, the judgment of the district court is affirmed, at appellants' costs.
Amended, and as amended, affirmed.